UNITED STATES of America

v.

Denis RIVERA Luis Alberto Cartagena Noe David Ramirez–Guardado

No. CRIM. 02–376–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 13, 2003.

Michael Rich, Ronald Walutes, United States Attorney's Office, Alexandria, VA, for Plaintiff.

Jerome P. Aquino, Robert Lee Jenkins, Jr., Bynum & Jenkins PLLC, John C. Kiyonaga, Kiyonaga And Kiyonaga, Alexandria, VA, Mark S. Thrash, Sher & Cummings, Arlington, VA, Paul P. Vangellow, Falls Church, VA, Lana Marie Manitta,

Martin, Arif, Petrovich & Walsh, Springfield, VA, for Defendants.

## *MEMORANDUM OPINION*

ELLIS, District Judge.

In this prosecution of three defendants for murder and conspiracy to murder, in violation of 18 U.S.C. §§ 2, 1111 & 1117, the government seeks to introduce at trial as hearsay exceptions under Rule 804(b)(6), Fed.R.Evid., a murdered witness' statements to her guardian and attorney that incriminate one of the defendants. In support, the government has presented evidence it believes shows that this defendant engaged or acquiesced in wrongdoing that led to the witness' murder. At issue is whether the government's evidence in this regard is sufficient to warrant the application of the Rule 804(b)(6) hearsay exception.

### I.

Defendant Denis Rivera and two co-defendants—Luis Alberto Cartagena and Noe David Ramirez–Guardado—were indicted and now face trial for the September 16, 2001 murder of Joaquin Diaz at Daingerfield Island, located on United States Park Service lands next to the George Washington Memorial Parkway and south of Ronald Reagan National Airport. Originally indicted for the same murder were three other individuals—Angel Barrera, Andy Salinas, and Fredie Baires—all of whom have now pled guilty and been sentenced. Yet, another individual, a juvenile, was also charged with the murder, but was inadvertently released from detention and is now a fugitive. The government alleges that Rivera and the five adults and one juvenile charged with Diaz's murder were all active members of Mara Salvatrucha, a violent Hispanic national youth gang commonly referred to as "MS–13."

More specifically, the government alleges that Rivera and Salinas met Diaz, an unarmed twenty-year-old not affiliated with MS–13, at a McDonald's Restaurant located in the 1400 block of North Beauregard Street in Alexandria, Virginia on the evening of September 16, 2001.[1] Shortly thereafter, Diaz accompanied Rivera and Salinas to an apartment in the Woodmont apartment complex on North Morgan Street in Alexandria, a known MS–13 hang-out. There, Diaz smoked marijuana with Rivera and several other MS–13 members and agreed to accompany MS–13 members to the District of Columbia to purchase more marijuana. The car in which Diaz traveled was driven by co-defendant Cartagena and carried other MS–13 members, namely Rivera, Baires, Barrera, and the fugitive juvenile. Cartagena drove the car to Daingerfield Island where he parked in the parking lot near a path leading to the river. Thereafter, Rivera and the other MS–13 members walked with Diaz down the path into the woods where they attacked Diaz with knives, stabbing him in the back, chest, face, and throat. Diaz also suffered knife wounds to his hands and arms, apparently inflicted as he tried to defend himself. Although one of the knife stabbings struck Diaz's heart, Rivera and various of his co-conspirators, to ensure the death of their victim, used a household steak knife to remove Diaz's esophagus and then left it approximately two feet from his body. The attack nearly severed Diaz's head and his lifeless body was left on a path in the woods. After the murder, Rivera returned with various co-conspirators to apartment 201 in the Woodmont apartments at 5520 North Morgan Street in Alexandria where they

---

1. Photo-surveillance tapes place all three men at the restaurant at approximately seven p.m. on September 16, 2001.

washed off Diaz's blood that had splattered on them in the course of the murder.

On July 3, 2003, the grand jury returned a two-count superseding indictment charging Rivera, Cartagena, and Ramirez–Guardado with conspiracy to commit murder in violation of 18 U.S.C. § 1117 and murder in violation of 18 U.S.C. §§ 2, 1111. On July 9, 2003, all three defendants were arraigned on this indictment and pled not guilty.[2]

In the course of its investigation of the Diaz murder, the government received assistance from Brenda Paz, a seventeen-year-old MS–13 member. Paz's extensive knowledge of the internal workings of MS–13 and its criminal activities, particularly the Diaz murder, were vital to the investigation. To protect her from retribution, intimidation, or murder by MS–13 members, the government placed Paz in the Witness Protection Program ("WPP").[3] While in the WPP, Paz made several statements to her guardian and attorney, Gregory Hunter, implicating Rivera in Diaz's murder. Specifically, Paz told Hunter that Rivera had confessed to the murder and specifically that Rivera told her that cutting Diaz's throat was like cutting chicken.

Not long after entering the WPP, Paz voluntarily left the program and returned to Northern Virginia. Approximately three weeks later, on July 17, 2003, Paz was murdered and her body was found on the banks of the North Fork of the Shenandoah River in Shenandoah County, Virginia.

The government now seeks to offer Paz's statements incriminating Rivera into evidence through the testimony of Hunter pursuant to Rule 804(b)(6), Fed.R.Evid., which provides an exception to the hearsay rule in circumstances where the party against whom the hearsay is offered either engaged or acquiesced in wrongdoing that resulted in the out-of-court declarant's unavailability to testify. In support of its motion, the government relies chiefly on a series of ten taped telephone conversations between Rivera and other MS–13 members while Rivera was in custody in the Fairfax and Arlington County Detention Centers between May 12, 2003 and August 12, 2003.[4] According to the government,

---

**2.** Consistent with his not guilty plea, Rivera claimed in an October 3, 2001 interview with Alexandria police that he was at Seven Corners in Fairfax County, Virginia by himself at the time of the Diaz murder.

**3.** *See* 18 U.S.C. § 3521 *et seq.*

**4.** The record reflects that telephone conversations of all prisoners, including Rivera, held at the Arlington County and Fairfax County Detention Centers were routinely recorded for security purposes. The sole exceptions to this routine practice are prisoners' privileged conversations with their attorneys. Rivera moved unsuccessfully in limine to preclude the use of these telephone conversations under 18 U.S.C. §§ 2510–2520, the Omnibus Crime Control and Safe Streets Act of 1968, which prohibits the use of any "electronic, mechanical, or other device to intercept any oral communication" without court authorization. *See* 18 U.S.C. § 2511(1)(b); *see also United States v. Rivera et al.*, 292 F.Supp.2d

838 (E.D.Va.2003) (forthcoming). The motion was denied following an evidentiary hearing on the grounds that the telephone intercepts were permissible pursuant to two statutory exceptions to the statute's prohibitions: (i) the law enforcement exception, 18 U.S.C. § 2510(5)(a), and (ii) the consent exception, 18 U.S.C. § 2511(2)(c). *See United States v. Hammond*, 286 F.3d 189, 192 (4th Cir.2002) ("Because the BOP [Bureau of Prisons] was acting pursuant to its well-known policies in the ordinary course of duties in taping the calls, the law enforcement exception exempted the actions of the BOP from the prohibitory injunction of Section 2511."); *United States v. Workman*, 80 F.3d 688, 693 (2d Cir.1996) (finding that defendant with notice of monitoring implicitly consented to the monitoring of his calls); *United States v. Sababu*, 891 F.2d 1308, 1328–29 (7th Cir.1989) (finding that defendant's taped conversations while incarcerated come within the law enforcement exception).

during these conversations, Rivera and other MS–13 members discuss (i) their involvement in the gang, (ii) Diaz's murder, (iii) their concern about Paz's cooperation with the government, and (iv) their desire to murder Paz to prevent her from testifying.[5] The government also relies on a letter from Livis Flores, also known as Junior, an MS–13 member currently awaiting trial for another murder in Texas. This letter was recovered in a search of Rivera's cell at the Arlington County Detention Center and reflects Rivera's involvement in MS–13 and Paz's murder. Additionally, the government presented the testimony of Detective Leonardo Bello of the Arlington County Police. Rivera, by counsel, cross examined these witnesses and presented the testimony of Nader Hassan, Rivera's attorney concerning state charges. Thus, the question presented here is whether the evidence offered by the government is sufficient to trigger application of Rule 804(b)(6).[6]

## II.

■ Rule 804(b)(6), Fed.R.Evid., creates an exception to the hearsay rule for statements "offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." This Rule was a 1997 addition to the Federal Rules of Evidence and codified the already existing common law forfeiture-by-misconduct doctrine.[7] Designed to serve the principles of equity, justice, and deterrence,[8] the Rule is rooted in the sensible notion that a defendant who "wrongfully procures the silence of a witness or potential witness, ... will be deemed to have waived his sixth amendment [confrontation] rights." *United States v. Dhinsa*, 243 F.3d 635, 652 (2d Cir.2001); *see also United States v. Cherry*, 217 F.3d 811, 815–16 (10th Cir.2000) (arguing that defendants who murder a witness "thereby waive their Confrontation Clause and hearsay objections to his out-of-court statements").

---

5. As the telephone call transcripts reflect, Rivera and his fellow gang members attempted unsuccessfully to conceal the meaning of their conversations by speaking in gang slang and code. Despite these efforts, the meaning of these conversations is discernible in context.

6. The telephone conversations and letter offered by the government are primarily in Spanish and were interpreted by Maria Horvath, a certified court-appointed interpreter. Ms. Horvath is thoroughly qualified with more than seventeen years of experience interpreting in federal courts in this and other districts. Her appointment in this case was agreed to by all parties.

7. *See United States v. Celestine*, 43 Fed.Appx. 586, 595, 2002 WL 1821971, at *7 (4th Cir. 2002) (discussing the common law doctrine); *United States v. Dhinsa*, 243 F.3d 635, 652 (2d Cir.2001) (discussing the codification of Rule 804(b)(6), Fed.R.Evid., in December 1997).

8. *See* Rule 804(b)(6), Fed.R.Evid., advisory committee's note ("This recognizes the need

for a prophylactic rule to deal with abhorrent behavior 'which strikes at the heart of the system of justice itself.' " (quoting *United States v. Mastrangelo*, 693 F.2d 269, 273 (2d Cir.1982))); *United States v. Thompson*, 286 F.3d 950, 962 (7th Cir.2002) ("The primary reasoning behind this rule is obvious—to deter criminals from intimidating or 'taking care of' potential witnesses against them."); *Dhinsa*, 243 F.3d at 651–52 (arguing that the Rule ensures equity between the parties); *United States v. Houlihan*, 92 F.3d 1271, 1282–83 (1st Cir.1996) ("The cardinal purpose of the waiver-by-misconduct doctrine is to ensure that a wrongdoer does not profit in a court of law by reason of his miscreancy."); *Steele v. Taylor*, 684 F.2d 1193, 1202 (6th Cir.1982) ("The rule ... is based on a public policy protecting the integrity of the adversary process by deterring litigants from acting on strong incentives to prevent the testimony of an adverse witness."); *United States v. Thevis*, 665 F.2d 616, 630 (5th Cir.1982) ("The law simply cannot countenance a defendant deriving benefits from murdering the chief witness against him.").

■ Although the Rule makes clear what a proponent of hearsay must show to trigger the exception, neither the Rule nor the Advisory Committee's Note states the burden of proof the proponent must bear in this regard.[9] Moreover, although the Fourth Circuit has considered the Rule on three occasions, it has not yet squarely addressed the appropriate burden of proof.[10] All other circuits that have addressed the question, save one, are uniform in requiring a party seeking admission of hearsay evidence under the Rule to prove the necessary elements by a preponderance of the evidence.[11] The exception is a now more than twenty-year-old Fifth Circuit opinion that applied a clear and convincing evidence standard in determining the admissibility of hearsay evidence under the common law forfeiture-by-mis-

conduct doctrine. *See Thevis*, 665 F.2d at 631. There, a Fifth Circuit panel noted that application of a preponderance standard was not sufficiently rigorous to assure the reliability of evidence and to protect a defendant's confrontation right. *See id.* This conclusory reasoning is unpersuasive; instead, the overwhelming weight of other circuit authority to the contrary is compelling and convincing. That authority holds that a preponderance of the evidence standard is sufficient to protect a defendant's constitutional right of confrontation in Rule 804(b)(6) cases because that standard results in a determination that "bears sufficient 'indicia of reliability' and 'guarantees of trustworthiness' to satisfy the commands of the confrontation clause" in the Rule 801(d)(2)(E), Fed.R.Evid., context.[12] Accordingly, for Rule 804(b)(6) to apply to Hunter's testimony regarding

9. As the Advisory Committee's Note observes, the "tests for determining whether there is a forfeiture have varied." Rule 804(b)(6), Fed. R.Evid., advisory committee's note.

10. In two cases, the Fourth Circuit affirmed the lower court's holding that Rule 804(b)(6) applied, but did not indicate whether it reached this conclusion under a clear and convincing standard of proof or a preponderance standard of proof. *See Celestine*, 43 Fed.Appx. 586, 595, 2002 WL 1821971, at *7 ("Under either a clear and convincing standard or a preponderance standard, we cannot say the district court abused its discretion in admitting the statements under the waiver-by-wrongdoing doctrine."); *United States v. Johnson*, 219 F.3d 349, 355 (4th Cir.2000) (affirming the district court's holding that the defendant "forfeited his hearsay objections, under FED. R. EVID. 804(b)(6), by having caused the unavailability of Thomas as a witness"). In a third case, *United States v. Lentz*, 58 Fed.Appx. 961, 2003 WL 253949 (4th Cir. 2003), the court based its decision on Rule 403, Fed.R.Evid., rather than Rule 804(b)(6), but, in dissent, Judge King argued that the court should have remanded to the district court for a determination of admissibility by a preponderance of the evidence under Rule 804(b)(6). *See Lentz*, at 964–65, 2003 WL 253949, at *3.

11. *See Cotto v. Herbert*, 331 F.3d 217, 235 (2d Cir.2003) (requiring that "the government prove by a preponderance of the evidence that the defendant procured the witness' unavailability"); *United States v. Scott*, 284 F.3d 758, 762 (7th Cir.2002) (applying a preponderance of the evidence standard); *United States v. Zlatogur*, 271 F.3d 1025, 1028 (11th Cir.2001) (same); *United States v. Price*, 265 F.3d 1097, 1103 (10th Cir.2001) (same); *United States v. Emery*, 186 F.3d 921, 926 (8th Cir.1999) (same); *United States v. White*, 116 F.3d 903, 911 (D.C.Cir.1997) (same); *Houlihan*, 92 F.3d at 1280 ("Unlike the Fifth Circuit, we think that the government need only prove such predicate facts by a preponderance of the evidence."); *Steele*, 684 F.2d at 1202 (applying a preponderance of the evidence standard). The Third and Ninth Circuits have not yet addressed the application of the Rule.

12. *United States v. Chindawongse*, 771 F.2d 840, 847 (4th Cir.1985). Several courts considering Rule 804(b)(6) have applied a preponderance of the evidence standard after analogizing to the necessary finding under Rule 801(d)(2)(E). *See Emery*, 186 F.3d at 926 (requiring proof by a preponderance of the evidence under Rule 804(b)(6), Fed. R.Evid., by adopting the standard from cases assessing Rule 801(d)(2)(E), Fed.R.Evid.); *White*, 116 F.3d at 912 ("[T]he forfeiture finding is the functional equivalent of the predi-

Paz's statements, the government must offer proof by a preponderance of the evidence. It remains to ascertain, however, what precisely the government must show in this context to trigger the Rule.

By its terms, Rule 804(b)(6) applies when a party "has engaged or acquiesced in wrongdoing" intended to result in a witness' unavailability. This language is purposefully broad and does not require that a party actually commit the requisite wrongful act intended to procure the witness' unavailability.[13] Taking its cue from the breadth of this language, the Seventh and Tenth Circuits have persuasively held that the Rule's requirement is satisfied by a showing that a defendant's role in procuring a witness' unavailability meets the

requirements for conspiratorial liability elucidated in *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).[14] Hence, in this instance, the government must show (i) that Rivera is a member of MS–13, (ii) that MS–13 was an ongoing conspiracy, and (iii) that Paz's murder "was within the scope and committed in furtherance of the... conspiracy, and was reasonably foreseeable to the [defendant]." *Thompson*, 286 F.3d at 961. Such a showing would make it appropriate to conclude that Rivera waived his Sixth Amendment right to confront Paz and hence any hearsay objection to Hunter's testimony regarding Paz's incriminating statements. *See Thompson*, 286 F.3d at 962; *Cherry*, 217 F.3d at 820.[15]

cate factual finding that a court must make before admitting hearsay under the co-conspirator exception."); *Houlihan*, 92 F.3d at 1280 (adopting a preponderance of the evidence standard in a Rule 804(b)(6) case after comparing to cases admitting out-of-court hearsay statements by co-conspirators); *Steele*, 684 F.2d at 1202.

**13.** *See Thompson*, 286 F.3d at 963 (stating that the language of the Rule indicates the drafters "intent to allow for the imputation of waiver"); *Cherry*, 217 F.3d at 816 ("Turning to the language of Rule 804(b)(6), the use of the words 'engaged or acquiesced in wrongdoing' lends support to the government's assertion that, at least for purposes of the hearsay rules, waiver can be imputed....").

**14.** *See Thompson*, 286 F.3d at 961; *Cherry*, 217 F.3d at 820 ("We do agree, however, that *Pinkerton*'s formulation of conspiratorial liability is an appropriate mechanism for assessing whether the actions of another can be imputed to a defendant for purposes of determining whether that defendant has waived confrontation and hearsay objections.").

*Pinkerton* and its progeny stand for the proposition that a defendant may be held criminally liable for the unlawful acts of his co-conspirators committed in furtherance of and within the scope of the conspiracy and reasonably foreseeable to the defendant. *See Pinkerton*, 328 U.S. at 647–48, 66 S.Ct. 1180.

While only the Seventh and Tenth Circuits have squarely applied the *Pinkerton* standard in Rule 804(b)(6) cases, the Second and Eighth Circuits have also admitted hearsay statements against a defendant not directly responsible for a witness' unavailability. *See Mastrangelo*, 693 F.2d at 273–74 (stating that waiver may be imputed if the defendant "was in fact involved in the death of [the witness] through knowledge, complicity, planning or in any other way"); *Olson v. Green*, 668 F.2d 421, 429 (8th Cir.1982) (finding that waiver may be imputed to the defendant if "someone acting on his behalf" was responsible for the witness' unavailability). *But see White*, 838 F.Supp. at 623 (rejecting co-conspiratorial waiver on the basis that "mere participation in the alleged drug conspiracy ... must surely be insufficient to constitute a waiver of a defendant's constitutional confrontation rights"), *aff'd*, 116 F.3d 903 (D.C.Cir.1997). The Fourth Circuit has not had occasion to address this issue because in both existing Rule 804(b)(6) cases, the evidence clearly showed that the defendant was directly responsible for murdering the witness. *See Celestine*, at 595, 2002 WL 1821971, at *7; *Johnson*, 219 F.3d at 356.

**15.** Rivera attempts to avoid this conclusion by arguing that application of the *Pinkerton* standard is inappropriate here because he has not acted affirmatively to harm Paz and "there is a presumption against the waiver of [defendant's] Sixth Amendment right of confrontation" that requires that defendant "engage in

In sum, for the reasons discussed above, to succeed on its motion under Rule 804(b)(6), the government must show by a preponderance of the evidence (1) that Rivera participated as a member of MS–13 in a conspiracy to murder Paz, (2) that Paz's murder was wrongfully procured within the scope and in furtherance of that conspiracy, and (3) that Paz's murder was reasonably foreseeable to Rivera. *See Thompson,* 286 F.3d at 963; *Cherry,* 217 F.3d at 820. It remains to be seen whether the evidence the government has offered in support of its motion is sufficient to meet this burden and trigger application of the Rule.

### III.

■ In support of its Rule 804(b)(6) motion, the government has offered evidence in the form of ten taped telephone conversations between Rivera and other MS–13 members, a letter recovered during a search of Rivera's cell at the Arlington County Detention Center, and testimony from three gang experts and Rivera's former attorney. This evidence, carefully parsed, points persuasively to seven key facts:

(1) that Rivera is a member of MS–13, a conspiracy;

(2) that MS–13 was an ongoing conspiracy at the time of Paz's murder;

(3) that Rivera was aware prior to Paz's murder of Paz's cooperation with the government in the investigation of his involvement in Diaz's murder;

(4) that Rivera desired to murder Paz at least two months prior to her death because she was cooperating with the government;

(5) that Rivera was aware of MS–13's plan to murder Paz at least a week prior to Paz's death;

(6) that Rivera at the very least acquiesced in MS–13's plan to murder Paz; and

(7) that members of MS–13 murdered Paz.

To begin, the evidence shows that there is no doubt that Rivera was a prominent member of MS–13, and thus a member of a conspiracy. The testimony of Henry Pacheco, a home-based counselor specializing in gang work and familiar with MS–13, and Detective Victor Ignacio of the Alexandria Police, a specialist in gang-related crime, at an October 3, 2002 hearing on the government's motion to transfer Rivera from juvenile to adult proceedings,[16] as well as the testimony of Detective Leonardo Bello of the Arlington County Police at the September 8, 2003 hearing on this motion make clear that MS–13 is a violent, criminal gang in which Rivera is a prominent member. (Tr. 94–103, 148–150 (Oct. 3, 2002); Tr. 26–27 (Sept. 8, 2003)). In fact, both Detective Ignacio and Detective Bello reported that Rivera explicitly conceded his MS–13 membership in 1999 and

---

an intentional knowing act of misconduct" before he can be deemed to have waived his right. (Def.Br.2). This argument does not alter the conclusion reached above because the caselaw clearly holds that hearsay statements may be admitted "against those defendants that did *not* affirmatively participate in the murder or its cover-up." *Thompson,* 286 F.3d at 961 (emphasis added); *see also Cherry,* 217 F.3d at 813; *Olson,* 668 F.2d at 429. Furthermore, the cases Rivera offers—*Brookhart v. Janis,* 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966), *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274

(1969), and *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)—do not support his argument. In none of these cases does the court hold that a defendant must have acted affirmatively in procuring a witness' unavailability for the court to find that the defendant has waived his right to confrontation.

**16.** The government moved successfully to transfer Rivera from juvenile to adult proceedings. *See United States v. D.R.,* 225 F.Supp.2d 694 (E.D.Va.2002), *aff'd,* 59 Fed. Appx. 530 (4th Cir.2003).

early 2003 respectively. (Tr. 161 (Oct. 3, 2002); Tr. 26–27 (Sept. 8, 2003)). Moreover, Detective Bello testified that he believed Rivera is a powerful MS–13 leader, presumably in the Big Gangster Loco Salvatruchas (BGLS) clique, because (i) Rivera indicated during a March 7, 2003 interview that "he has pull and... power in the gang" such that he "has people who could [kill Paz] for him," (Tr. 23–24 (Sept. 8, 2003)), and (ii) because Junior, an MS–13 member in Texas, wrote a letter to Rivera in 2003 seeking specific direction on what to do about Paz's cooperation with the government. (Tr. 35–36 (Sept. 8, 2003); Gov't Ex. A).

Importantly, Rivera's own statements between May and August 2003 while in custody awaiting trial confirm not only the testimony discussed above, but also establish that MS–13 was an ongoing conspiracy in which Rivera was participating at the time of Paz's murder in July 2003. Rivera's numerous references to MS–13 in telephone conversations during this period—either by calling it "Mara," for Mara Salvatrucha, or "VLS," the acronym for Virginia Locos Salvatruchas, the MS–13 clique that allegedly ordered Diaz's murder—make clear that the MS–13 conspiracy was then ongoing and active. (Gov't Ex. B at 2; Gov't Ex. E at 12; Gov't Ex. G at 8; Gov't Ex. H at 10). In addition, on May 12, 2003, Rivera told J.L., a juvenile MS–13 member, also known as Philosopher, to tell Brenda Paz "that Mr. Conejo [17] is the top dog." (Gov't Ex. B at 2). This statement, presumably intended as a

threat to Paz, confirms that Rivera continued to play a leadership role in the MS–13 conspiracy at that time, notwithstanding his incarceration.

The record further reflects that Rivera was undoubtedly aware approximately two months prior to Paz's murder that Paz was cooperating with the government in its investigation of Diaz's murder. In an undated letter written prior to Paz's murder, Junior warned Rivera that Paz was already cooperating with the government— "Watch out this problem, she is crazy, she started singing to my family, believing that she was one of those who sing ballads and she told my uncle how the river flowed." (Gov't Ex. A). Moreover, during a May 14, 2003 telephone conversation, Philosopher also alerted Rivera to Paz's cooperation by making clear his concern that Paz was "greasing" or "ratting on" Rivera. (Gov't Ex. E at 1, 3). Later in the conversation, he reiterated this concern when he told Rivera, "to tell you the truth I think that she threw a rat on you." (Gov't Ex. E at 10).

Shortly after being warned of Paz's cooperation, Rivera specifically stated in two conversations with Philosopher that he, Rivera, was aware of Paz's cooperation and wished to murder her to prevent her from testifying against him. Thus, in a May 13 conversation, Rivera asked Philosopher to "talk to [Paz] about the child, the abortion... because if I arrive one day and I make her like that and both of them leave. It's better for only one to leave." [18] (Gov't Ex. C). Rivera's use of the word "leave"

---

**17.** Rivera's gang nickname is "Conejo," which is Spanish for rabbit.

**18.** Although Rivera did not specifically refer to Paz by name in this conversation, it is nonetheless clear that he was speaking of Paz, as Paz later told Philosopher she was pregnant and Philosopher asked her if she intended to have an abortion. (Gov't Ex. D at 6). Worth noting is that Rivera regularly sought

to circumvent prison rules regarding phone usage by making one call and then asking that individual to connect him by three-way calling to another person. In this instance, Rivera called Philosopher who connected him to Paz, so that Rivera could listen to the conversation between Philosopher and Paz without Paz's knowledge. In other instances, Rivera used this technique to speak with more than one individual on the same call.

in this context means "die," and hence, this statement shows Rivera's desire to murder Paz, and his somewhat illogical preference that she have an abortion first so that he would not also kill her unborn child or fetus. In a conversation the following morning, Rivera told Philosopher that "if [Paz] wants to play games, we will play games... And then well, charros-churros.[19] In a park, you know, we have to pisarla," and directs Philosopher to "pisan, bah, such a big pisada that you won't even be able to get up after that." (Gov't Ex. E at 6, 12). By using the Spanish verb "pisar," which means "to fornicate," Rivera made clear his intent that Paz be killed. Rivera's statements in this conversation also confirm that he wanted to kill her because she "play[s] games" with him—i.e. because she was cooperating with the government and "ratting on him" in connection with the Diaz murder.

Nor is there any doubt that Rivera's chief preoccupation concerning Paz's cooperation was with regard to the Diaz murder investigation and not the other state charges he was facing during the same time period in Arlington and Alexandria for unrelated crimes. In his various telephone conversations, Rivera made only a few minor references to these other pending charges and specifically noted that he was chiefly concerned about the federal murder charge. (Gov't Ex. D at 13–14; Gov't Ex. H at 28–32). Thus, the record reflects that Rivera's primary motivation to kill Paz was to prevent her from testifying at his federal trial for Diaz's murder.

Significantly, the evidence makes clear that Rivera was aware that members of MS–13 planned to kill Paz at least one week before her murder. Thus, on July 3, 2003, Rivera's brother, Payaso, informed Rivera that Philosopher had "something important to tell you about Smiley,"[20] and then Rivera, without any additional information from Payaso or Philosopher, quickly responded, "She... disappeared or something?" The immediacy of this response reveals that Rivera was already aware, more than a week before Paz's death, that members of MS–13 planned to murder her. (Gov't Ex. F at 2). Two later conversations confirm Rivera's awareness of this plan. Thus, in the same telephone call made initially to Payaso, Philosopher told Rivera that MS–13 planned to murder Paz in the near future.

PHILOSOPHER: Do you know the situation with [Paz]?

RIVERA: No. What situation?

PHILOSOPHER: About the light.

RIVERA: Oh! What about it?

PHILOSOPHER: That she already has it.... That they have given it to her.... Right, soon, in a while they are going to do it. (Gov't Ex. F at 7).

The next day, Rivera informed his sister, Claudia, of the gang's plan when he told her "that they had given her the green [light]." (Gov't Ex. K at 2). The context of these conversations as well as Detective Bello's testimony that a "light" is a uniformly understood MS–13 coded order to murder someone[21] leaves no doubt that

---

19. There is no direct English translation for the Spanish term "charros-churros." It is a slang term meaning essentially "of this we should talk no further." Rivera used the term on several occasions to warn Philosopher and others not to say too much about the gang's plans, presumably because he was aware his telephone conversations were recorded and perhaps monitored. (Gov't Ex. C; Gov't Ex. E at 6, 9; Gov't Ex. G at 5).

20. Paz's gang nickname was "Smiley."

21. In Detective Bello's testimony regarding the letter from Junior he discusses the gang's use of the slang term "light" as follows:

[Junior] turned on the traffic light—which translates to the green light... means you turn on the traffic light, which means you put on the green light, green light meaning you put on a hit on somebody....

Tr. 33 (Sept. 8, 2003).

**836**

Rivera was well aware of MS–13's plan to murder Paz to prevent her from testifying against him.

Given Rivera's leadership role in MS–13, he surely could have halted the plan and hence it follows that he, at the very least, acquiesced in it.[22] Indeed, far from preventing Paz's murder, Rivera gloated about it in a July 29, 2003 conversation with Monica Rodriguez.

RIVERA: Uh! *Charros . . .* they rat on "Conejo" and that's it.

RODRIGUEZ: That one?

RIVERA: Uh-huh *charros-churros* [chuckles]

RODRIGUEZ: It's also over for her?

RIVERA: Aha! They rat and that's it.

RODRIGUEZ: [she] didn't deliver then?

RIVERA: How could she

RODRIGUEZ: *Bicha cojún*

RIVERA: Yes. And how could she if she is in the other under . . . world

RODRIGUEZ: No

RIVERA: [laughs] Hey [laughs] *charros churros* don't make noise. (Gov't Ex. G at 12).

Rivera's gloating over Paz's death is consistent with his complicity in it.

Finally, the evidence reflects that MS–13 members did in fact murder Paz. In a series of telephone conversations in July and August 2003, Rivera and other gang members acknowledge MS–13's responsi-

bility for Paz's murder. For example, on July 29, 2003, approximately two weeks after Paz's body was recovered, Rivera told a juvenile MS–13 member, also known as Little Chato, that "the problem with Risa[23] . . ., that it already happened," and asked whether the gang members discussed Paz's death at a recent gang meeting.[24] (Gov't Ex. G at 5). The ensuing conversation points persuasively to the conclusion that MS–13 members murdered Paz and that this was done to prevent her from testifying against Rivera.

RIVERA: But the homeboys[25] already knew about the problem, bah?

CHATO: Yes. From the first time and . . .

RIVERA: But the homeboys knew already, when bah?

CHATO: Yes

RIVERA: That she was going to rat on me, right?

CHATO: Right

RIVERA: *All right, and that's when they hit her, right?*

CHATO: *Yeah*

(Gov't Ex. G at 6) (emphasis added). Rivera again clearly placed responsibility on MS–13 for Paz's murder when he told Monica Rodriguez that Paz "went to the other . . . they rat on Conejo and that's it . . . she is in the other under . . . world."[26] (Gov't Ex. G at 12).

22. Rivera's July 4, 2003 statement to Claudia that he was "telling . . . [her about the green light] so that it doesn't happen," is a self-serving statement intended only to misdirect the government in its investigation. (Gov't Ex. K at 3). At no other time did Rivera indicate that he did not approve of the gang's plan to murder Paz or desired the gang to abandon its plan.

23. Rivera referred to Paz as "Risa" here. The reference to Paz is clear because the Spanish word "sonrisa" means smile and Paz's gang nickname was Smiley.

24. Rivera asked, "did they talk about that at the mass or what happened?" (Gov't Ex. G at 5). The context of these statements makes clear that a "mass" is a gang meeting and that Rivera specifically referred to Paz's murder.

25. Rivera used the term "homeboys" to refer to his fellow gang members.

26. [This footnote is under seal because it contains information from an ongoing murder investigation.]

In sum, the record, by a preponderance of the evidence, establishes (i) that Rivera is a member of MS–13, an ongoing conspiracy, (ii) that Rivera was a leader in the gang, (iii) that Rivera was aware that Paz was cooperating with authorities in its investigation of the Diaz murder, (iv) that Rivera desired to murder Paz to prevent her from testifying against him, (v) that Rivera's chief preoccupation concerning Paz's cooperation was with regard to his federal murder charge, (vi) that Rivera was aware that MS–13 members planned to murder Paz after she left the WPP in June 2003, (vii) that Rivera at least acquiesced in the plan to murder Paz, (viii) that MS–13 members murdered Paz, and (ix) that Rivera gloated about the murder. These facts collectively point persuasively to the conclusion (1) that Paz's murder was committed within the scope of and in furtherance of a conspiracy in which Rivera participated and (2) that this murder was reasonably foreseeable to Rivera. *See Thompson,* 286 F.3d at 963; *Cherry,* 217 F.3d at 820. Accordingly, Rivera is properly deemed to have waived his Sixth Amendment confrontation right and right to assert a hearsay objection to Hunter's testimony at trial regarding statements made to him by Paz inculpating Rivera in Diaz's murder. Hence, Hunter's testimony is admissible pursuant to Rule 804(b)(6), Fed.R.Evid. Moreover, despite Rivera's contention to the contrary, the government need not proffer evidence that Rivera was directly involved in Paz's murder or that Rivera took any affirmative steps to procure her silence. *See Thomp-son,* 286 F.3d at 961; *Cherry,* 217 F.3d at 813; *Olson,* 668 F.2d at 429. To conclude otherwise would unfairly permit Rivera to escape the consequences of his involvement in the conspiracy to murder Paz and create incentives for other defendants to engage in witness intimidation and tampering, thus imperiling not just witnesses, but the integrity of the judicial process.[27]

Only the admissibility of Hunter's testimony pursuant to Rules 403, Fed.R.Evid., remains to be resolved. To begin with, there can be no doubt as to the strong probative value of Hunter's testimony that Rivera admitted to Paz that Rivera participated in murdering Diaz and that cutting Diaz's throat was like cutting chicken. Nor is there any doubt that this testimony passes muster under Rule 403 because its strong probative value is not "substantially outweighed by the possibility of unfair prejudice;" there is no genuine risk, " 'disproportionate to the probative value' " of the testimony, " 'that the emotions of the jury will be excited to irrational behavior.' " *United States v. Wells,* 163 F.3d 889, 896 (4th Cir.1998) (citing *United States v. Bailey,* 990 F.2d 119, 123 (4th Cir.1993)).[28]

An appropriate order has issued. *See United States v. Rivera et al.,* Criminal Action No. 02–376–A (E.D.Va. Oct. 6, 2003) (Order).

---

**27.** *See Thompson,* 286 F.3d at 963 ("Without a rule of coconspirator waiver, the majority of the members of a conspiracy could benefit from a few members engaging in misconduct."); *Cherry,* 217 F.3d at 820 ("Failure to consider *Pinkerton* conspiratorial responsibility affords too much weight to Confrontation Clause values in balancing those values against the importance of preventing witness tampering.").

**28.** An earlier authenticity objection to the telephone transcripts pursuant to Rule 901, Fed.R.Evid., was overruled. Fourth Circuit caselaw confirms that telephone conversations may be authenticated based upon " 'the content of the conversation combined with the caller's selfidentification [sic].' " *Wells v. Liddy,* 37 Fed.Appx. 53, 63 (4th Cir.2002) (citing *United States v. Console,* 13 F.3d 641, 661 (3d Cir.1993)).