STATE of Wisconsin, Plaintiff-Respondent,

v.

Glenn H. HALE, Defendant-Appellant-Petitioner.

Supreme Court

*No. 03–0417–CR. Oral argument September 21, 2004.—Decided January 25, 2005.*

2005 WI 7

(Also reported in 691 N.W.2d 637.)

594

For the defendant-appellant-petitioner there were briefs and oral argument by *Steven D. Phillips,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *James M. Freimuth,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

¶ 1. ANN WALSH BRADLEY, J.   The petitioner, Glenn Hale, seeks review of a decision of the court of appeals affirming his convictions, which included two counts of first-degree intentional homicide, party to a crime.[1] Hale asserts that he is entitled to a new trial because the circuit court improperly allowed into evidence the former testimony of an unavailable witness.

---

[1] *State v. Hale,* 2003 WI App 238, 268 Wis. 2d 171, 672 N.W.2d 130 (affirming a decision of the circuit court for Kenosha County, David M. Bastianelli, Judge).

¶ 2. We agree with Hale that the testimony in question should not have been admitted in this case. Such evidence violated Hale's right to confrontation, as he did not have a prior opportunity to cross-examine the witness. However, we also conclude that it is beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained and was therefore harmless. Accordingly, albeit with different rationale, we affirm the court of appeals.

## I

¶ 3. On December 8, 2001, two men forced their way into a Kenosha apartment and robbed its three occupants of drugs and money. One of the robbers was masked and armed with a revolver, which he used to fatally shoot two of the victims, Darrel Stone and Joshua Kressel.

¶ 4. Two days later, the police received an anonymous tip that Robert Jones and his brother-in-law, Glenn Hale, had committed the offenses. The police arrested Jones on December 12, 2001, and Hale in the early morning of December 14, 2001. Jones was tried and convicted in May 2002, while Hale was tried separately two months later.

¶ 5. At Hale's jury trial, Mark Bernhardt, the surviving victim, described the crimes in detail. He testified that he, Stone, and Kressel were watching television when he heard a car pull into the adjacent driveway. About two minutes later, a male identifying himself as "Vinnie" knocked on the door. Not knowing anyone by that name, the victims did not initially open the door. When the knocking persisted, however, Stone answered it, and Bernhardt heard what sounded like a gunshot.

¶ 6. Bernhardt testified that two men then entered the apartment. He identified the first man to come in as Jones. The other man stood in the doorway dressed completely in black, wearing a ski mask, hooded sweater, and gloves. Bernhardt indicated that the masked man was short and wielded a worn-looking revolver.

¶ 7. According to Bernhardt, Jones did the talking, demanding drugs and money from the victims. When Bernhardt did not respond quickly enough, Jones picked him up by his hair. Bernhardt gave his money to Jones and got on the floor with his back to Jones. Bernhardt then heard two more gunshots. Looking over his shoulder, he witnessed the men exit the apartment and saw Kressel injured and bleeding.

¶ 8. Bernhardt fled to the bathroom and called 911 on his cell phone. He heard a car leaving, looked out the window, and saw what he believed to be the profile of a 1989 Chevy Beretta pulling out of the driveway. Bernhardt testified that as the son of a mechanic he had been around cars all of his life. He explained that when viewed from the side, a 1989 Chevy Beretta looks very similar to a 1989 Chevy Corsica.

¶ 9. The principal question at Hale's trial was whether Hale was the masked gunman who participated in the crimes with Jones. Because Bernhardt could not identify the masked gunman, the State presented a circumstantial case. The admission of former testimony is the sole evidentiary issue in this case. To place the testimony in its proper context, it is necessary initially to review the evidence the State introduced at trial.

## A. *The Case Against Glenn Hale*

¶ 10.   Jones, Hale, Tammy Jones (Hale's sister and Jones's wife) and Joy Baker (Hale's girlfriend) shared an apartment in Kenosha. Baker testified that Hale and Jones were together at the apartment until 5:00 p.m. on December 8, 2001, approximately 30 minutes before the double homicide. She said the two men left the apartment separately and were headed to the residence of Hale's grandfather, Milton Johnson, Sr.

¶ 11.   Vera Blalock, who lived with Hale's grandfather, confirmed the men's arrival. She testified that Hale and Jones met at the residence, talked privately in the bathroom, and then left together. According to Blalock, Hale returned approximately 15 minutes later. He was wearing a black coat with a hood.

¶ 12.   Kim Kelly, a friend and visitor to the Jones/Hale apartment, testified that when Jones returned to his apartment later that evening, he was visibly upset. According to Kelly, Hale did not return to the apartment until 7:00 p.m., at which time he and Jones talked in another room. Kelly described their conversation as "not friendly" and "shady."

¶ 13.   A police detective testified that he test drove and timed the three most likely routes that Hale and Jones might have used on the night of the murders. The round-trip travel time between the Jones/Hale apartment and the murder scene was between 10 and 12 minutes. The residences of both Hale's grandfather and Hale's mother were along at least one of these routes.

¶ 14.   A few days before the murders, LaQwandris Johnson, who knew both Hale and Jones, went to the victims' apartment to purchase marijuana. Jones accompanied him but remained in the car during the drug transaction. After the purchase, Johnson gave some

marijuana to Jones, who asked whether the dealer (one of the eventual victims) was "all right," and whether he was a "tough guy."

¶ 15.  Johnson's girlfriend, the tipster who had alerted the police to Jones's and Hale's possible involvement, told them that a car generally matching the description of the car given by the victim, Bernhardt, had been "very active in the neighborhood" prior to the murders but not afterwards. The police confirmed that a black 1989 Chevy Corsica, which looks like a 1989 Chevy Beretta in profile, was parked at the residence of Hale's mother two days after the double homicide and had been available for Hale's use.

¶ 16.  After arresting Jones, the police attempted to locate Hale. Since December 10, 2001, two days after the murders, Hale had been living in a hotel with his girlfriend, Baker. Knowing that Baker worked at a bar, the police placed it under surveillance. In the early morning hours of December 14, 2001, they saw Baker leave the bar and get into a rental car driven by Hale. The car, which was equipped with an activated police scanner, sped away when the police attempted to initiate a stop.

¶ 17.  Hale led 12 to 14 marked units in a high-speed chase from Kenosha to Milwaukee, with speeds in excess of 100 miles per hour. Baker testified that during the chase, Hale asked her to remove the holstered revolver that was strapped across his shoulder and to throw it out the window. She instead put the gun and some ammunition underneath the seat. Hale also told Baker that it "would be probably his last time seeing [her]" and "to write him in jail."

¶ 18.  Ultimately, Hale slowed the car down to about five miles per hour, at which point he jumped from the driver's seat and took off running through the

neighboring residential area. The officers pursued Hale on foot, eventually apprehending him at gunpoint.[2]

¶ 19.  Hale was wearing dark-colored pants when he was arrested. A black, hooded coat was found in the rear of the rental car. After Hale was taken to jail, the police found a pair of black knit gloves concealed under the seat bench of the squad car where Hale had been sitting.

¶ 20.  After his arrest, the police briefly interviewed Hale about the double homicide. He denied committing the murders, stating that he had been at his grandfather's residence. At some point thereafter, Hale tapped on the door of his holding cell to make a bathroom request and, with eyes tearing up, told a detective, "man, if I did it, I just don't remember." Hale repeated this statement to another detective.

¶ 21.  Baker testified that a few days before the murders, she was with Hale when he purchased a black ski mask. A day or two after he was arrested, Hale called and told her that he had hidden the ski mask under the "plastic bottom" of her duffel bag and instructed her to "get rid" of it. Baker said she cut up the ski mask and gave it to her friend, Kelly, who was in the room when Hale called. Kelly, in turn, stated that she burned the mask pieces and flushed them down a toilet.

¶ 22.  James Toy, who was confined in the same cellblock as Hale, testified that Hale confessed to committing the double homicide. According to Detective Strash, when he and another detective interviewed Toy in the spring of 2002, Toy repeated details of the murders that had neither appeared in the media nor

---

[2] The defense advances that Hale may have had reason to flee because it could be inferred that he was aware of the existence of a probation hold for him relating to another matter.

been suggested to him by the detectives.[3] Toy explained that he came forward because a younger brother of his had been murdered.

¶ 23.   Arguably the most critical evidence produced by the State was the fully loaded, single-action .44 magnum revolver found in the rental car Hale had been driving. The officer who searched the car discovered it beneath a shirt on the floor, under the driver's seat. The parties stipulated that this gun fired the shots that killed Stone and Kressel.

¶ 24.   Baker testified that Hale obtained a gun and holster from David Sullivan, a life-long friend of Hale's, about one week before the murders and kept the gun on his person "a lot." She stated that the murder weapon "looked like" the gun Hale had obtained from Sullivan. It was the subsequent admission of Sullivan's former testimony that is the sole evidentiary issue in this case.

## B. *David Sullivan's Former Testimony*

¶ 25.   Sullivan testified at Jones's trial, which was tried two months prior to Hale's scheduled trial. On direct examination, he said he had known Hale "for a long time," indicating that they have been friends since childhood. Sullivan testified that the gun shown to him at Jones's trial "look[ed] like" the gun he provided to Hale at Hale's request. Although he did not know for sure, he "guess[ed]" that he had given the gun to Hale at the Jones/Hale residence "about six months ago," which would have been November 2001, before the double homicide of December 8, 2001.

---

[3] For example, Toy had knowledge that one of the perpetrators identified himself as "Vinnie" at the victims' apartment. Furthermore, Toy indicated that Jones entered the room before the masked gunman.

¶ 26.   On cross-examination, Sullivan acknowledged that shortly before the start of the trial, he had written a letter to the prosecutor and the judge, asserting that he was "afraid to take the stand" and had suffered from "some kind of altered mental state" that deprived him of the ability to "distinguish between the truth and [falsity] of what [he had] written in [his] previous statements." Sullivan also testified that he told authorities that he was "sure" he had given the gun to Hale and not to Jones.

¶ 27.   Finally, on redirect examination, Sullivan conceded that his "mental state" was attributable in part to the guilt he felt about having given Hale the murder weapon. The jury found Jones guilty of the charges.

¶ 28.   Subsequently, the State subpoenaed Sullivan to testify on its behalf at Hale's trial but was unable to locate him. According to the State, Sullivan's mother gave police his address, but Sullivan's girlfriend refused them access to the residence. The court then issued a material witness warrant for Sullivan. At the close of the second day of trial, the State reported that he was still being sought.

¶ 29.   Anticipating that the State may seek to use Sullivan's prior testimony from Jones's trial, Hale's counsel filed a motion to exclude such evidence. She argued that the testimony did not satisfy the applicable hearsay exception because Jones's motive and interest in cross-examining Sullivan were not sufficiently similar to Hale's. Defense counsel also asserted that Hale's right to confrontation was violated by the admission of the testimony.

¶ 30.   On the morning of the third day of trial, the State informed the court that police had searched the residence where Sullivan was believed to be staying but

did not find him. The State submitted that Sullivan's prior testimony from Jones's trial was sufficiently reliable to be admitted at Hale's trial because it was given under oath in a setting where Jones's counsel had complete ability to conduct cross-examination.

¶ 31. The circuit court allowed the State to introduce Sullivan's prior testimony from Jones's trial. It determined that the evidence fit the "former testimony" hearsay exception of Wis. Stat. § 908.045(1) (2001–02) because Jones's interest in cross-examining Sullivan was "similar" to Hale's and Sullivan was unavailable.[4] The court also concluded that Sullivan's prior testimony would not violate Hale's confrontation right because the exception was firmly rooted.

¶ 32. Sullivan's prior testimony from Jones's trial was then read to the jury, identified for jurors as "testimony at a prior proceeding." The prosecutor and Hale's counsel read, respectively, the direct and cross-examination questions of Sullivan, while a police detective read Sullivan's answers to the questions.

¶ 33. The jury found Hale guilty of six crimes, including two counts of first-degree intentional homi-

---

[4] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

Wisconsin Stat. § 908.045(1) provides:

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) FORMER TESTIMONY. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of another proceeding, at the instance of or against a party with an opportunity to develop the testimony by direct, cross-, or redirect examination, with motive and interest similar to those of the party against whom now offered.

cide, party to a crime. After his conviction, Hale appealed the circuit court's admission of Sullivan's testimony.

¶ 34. On appeal, Hale maintained that Sullivan's prior testimony did not satisfy the "former testimony" exception of Wis. Stat. § 908.045 because Jones did not have "motive and interest similar to" Hale in his cross-examination. Alternatively, Hale argued that admission of Sullivan's prior testimony violated his right to confrontation because the "former testimony" exception, as applied to Sullivan's prior testimony, was not firmly rooted and lacked "particularized guarantees of trustworthiness."

¶ 35. The court of appeals affirmed the circuit court decision. It determined that Sullivan's prior testimony satisfied the "former testimony" hearsay exception because Jones had a motive and interest similar to Hale "to discredit any link between Hale and the murder weapon." *State v. Hale*, 2003 WI App 238, ¶ 17, 268 Wis. 2d 171, 672 N.W.2d 130.

¶ 36. With respect to Hale's right to confrontation, the court of appeals expressed doubt that the "former testimony" exception was firmly rooted as applied to the facts of the case. *Id.*, ¶¶ 25–30. However, the court noted that it was bound by its prior decision in *State v. Bintz*, 2002 WI App 204, ¶ 20, 257 Wis. 2d 177, 650 N.W.2d 913, which concluded, without explanation, that the former testimony hearsay exception was firmly rooted.

¶ 37. In addition, the court of appeals observed that Sullivan's testimony would still be admissible even if the "former testimony" exception were not firmly rooted. *Id.*, ¶ 31. It did so because the prior testimony at issue bore "particularized guarantees of trustworthiness." *Id.*, ¶¶ 31–32.

¶ 38. Finally, the court of appeals offered two alternative bases for its holding. First, it observed that Sullivan's testimony was also admissible under the "residual hearsay exception" of Wis. Stat. § 908.045(6).[5] *Id.*, ¶ 32, n. 5. Second, even if the circuit court had erred in admitting the evidence, the error was harmless. *Id.*

¶ 39. This court granted Hale's petition for review. Less than two weeks later, the United States Supreme Court decided *Crawford v. Washington,* 124 S. Ct. 1354 (2004), which dramatically altered the legal landscape of Confrontation Clause jurisprudence.

## II

¶ 40. The initial issue in this case is an evidentiary one. It asks whether Hale is entitled to a new trial on the ground that the circuit court improperly allowed into evidence former testimony that an unavailable witness had given at a separate trial of Hale's codefendant.

¶ 41. While a circuit court's decision to admit evidence is ordinarily a matter for the court's discretion, whether the admission of such evidence violates a defendant's right to confrontation is a question of law subject to independent appellate review. *State v. Will-*

---

[5] Wisconsin Stat. § 908.045(6) provides:

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(6) OTHER EXCEPTIONS. A statement not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness.

*iams*, 2002 WI 58, ¶ 7, 253 Wis. 2d 99, 644 N.W.2d 919
(citing *State v. Ballos*, 230 Wis. 2d 495, 504, 602 N.W.2d
117 (Ct. App. 1999)).

## III

¶ 42. We begin our discussion by examining
whether Hale's right to confrontation was violated by
the circuit court's admission of Sullivan's testimony.
Normally this court will not address a constitutional
issue if the case can be disposed of on other grounds.
*Labor and Farm Party v. Elections Bd.*, 117 Wis. 2d 351,
354, 344 N.W.2d 177 (1984) (citing *Kollasch v. Ada-
many*, 104 Wis. 2d 552, 561, 313 N.W.2d 47 (1981)).
Nevertheless, we deviate from this general rule here in
light of the recent *Crawford* decision and its import on
Confrontation Clause jurisprudence in this state.[6] Ac-
cordingly, we do not discuss whether the prior testi-
mony is admissible under a recognized hearsay excep-
tion. Rather, for purposes of this opinion, we assume
the testimony at issue was properly admitted under a
relevant hearsay exception.

¶ 43. The Confrontation Clauses of the United
States and Wisconsin Constitutions guarantee criminal
defendants the right to confront the witnesses against
them. The Sixth Amendment of the United States
Constitution states, "[i]n all criminal prosecutions, the

---

[6] As defense counsel noted at oral argument, there is good
reason to address the constitutional question first. To begin,
given the recent decision of *Crawford v. Washington*, 124 S. Ct.
1354 (2004), the confrontation issue is the easiest to resolve.
Moreover, *Crawford* largely renders academic the hearsay ex-
ceptions because prior testimony may only be admitted against
a criminal defendant when that defendant has had a prior
opportunity to cross-examine the witness.

accused shall enjoy the right . . . to be confronted with the witnesses against him."[7] Similarly, Article I, Section 7 of the Wisconsin Constitution provides, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to meet the witnesses face to face." Wisconsin courts will generally apply United States Supreme Court precedents when interpreting both Clauses. *See, e.g., State v. Weed,* 2003 WI 85, ¶ 23, 263 Wis. 2d 434, 666 N.W.2d 485.

¶ 44.    At the time of Hale's trial and appeal, *Ohio v. Roberts,* 448 U.S. 56 (1980), provided the general framework for determining the admissibility of out-of-court statements under the Confrontation Clause. There, the Court upheld the use at trial of preliminary hearing testimony of a witness who the State was unable to locate. *Id.* at 76. Although the defendant was unable to confront and cross-examine the witness at trial, the Court found no violation of the Confrontation Clause. *Id.* It concluded that the circumstances under which the prior testimony was given provided sufficient "indicia of its reliability." *Id.* at 73.

¶ 45.    With its decision, the *Roberts* Court established a two-step approach for analyzing the admission of hearsay evidence under the Confrontation Clause. *Id.* at 66. First, the witness must be "unavailable" at trial. *Id.* Second, the statement of the unavailable witness must bear adequate "indicia of reliability." *Id.* This second prong could be inferred without more in a case where the evidence fell within a firmly rooted hearsay exception or upon a showing of "particularized guarantees of trustworthiness." *Id.*

---

[7] This Sixth Amendment guarantee applies to state prosecutions through the Fourteenth Amendment. See *Pointer v. Texas,* 380 U.S. 400, 403–05 (1965).

¶ 46.  The continuing vitality of the *Roberts* approach was recently called into question in *Crawford v. Washington,* 124 S. Ct. at 1354. There, the defendant had stabbed a man who allegedly tried to rape his wife. *Id.* at 1356. At trial, the wife did not testify because of the invocation of the marital privilege. *Id.* at 1357. The State played for the jury the wife's tape-recorded statement taken by the police during the investigation, which described the stabbing. *Id.* at 1356–57. The question presented was whether this procedure violated the defendant's right to confrontation. *Id.* at 1357. The Court determined that it did and reversed the defendant's convictions. *Id.* at 1374.

¶ 47.  Writing for the majority, Justice Scalia first examined the historical roots of the Confrontation Clause. *Id.* at 1359–63. Of particular significance was the 1603 English treason trial of Sir Walter Raleigh. *Id.* at 1360. Raleigh was convicted and put to death on the basis of an out-of-court accomplice statement obtained by the Crown. *Id.* He was never permitted a face-to-face confrontation of the accuser. *Id.* Raleigh's death provoked outrage at the fundamental unfairness of convicting a person based on such evidence. *Id.*

¶ 48.  The Court concluded that this and other historical precedent supported two inferences about the meaning of the Confrontation Clause. First, "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations against the accused." *Id.* at 1363. Second, "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 1365.

¶ 49. After its historical analysis, the Court turned to the relevant case law. It observed that "[a]lthough the results of our decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales." *Id.* at 1369. The Court then identified the *Roberts* case as the primary source of infidelity. *Id.* One of *Roberts'* flaws was admitting statements that consist of ex parte testimony upon a mere finding of reliability. *Id.* Such a standard "often fails to protect against paradigmatic confrontation violations." *Id.*

¶ 50. Expounding on its criticism of *Roberts,* the Court noted that, "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' " *Id.* at 1370. The Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* The *Roberts* approach, by contrast, replaced this prescribed method of assessing reliability with a "wholly foreign one" based on judicial determination. *Id.*

¶ 51. Although the Court acknowledged that it could resolve the case by reweighing the "reliability factors" of *Roberts,* it declined to do so. *Id.* at 1373. Such a result "would perpetuate, not avoid, what the Sixth Amendment condemns." *Id.* Consequently, the Court abrogated the *Roberts* approach for determining the admissibility of "testimonial" hearsay statements. It held that where "testimonial" hearsay evidence is at issue, the Sixth Amendment demands what the com-

mon law required: (1) unavailability and (2) a prior opportunity for cross-examination. *Id.* at 1374.[8]

¶ 52. With the *Crawford* decision, a new day has dawned for Confrontation Clause jurisprudence. Hale is the beneficiary of this renaissance because he properly preserved the constitutional issue and his case is still on direct appeal. *State v. Koch,* 175 Wis. 2d 684, 694, 499 N.W.2d 152 (1993) (citing *Griffith v. Kentucky,* 479 U.S. 314, 328 (1987)). Accordingly, we consider the applicability of *Crawford* to his case.

¶ 53. A threshold question for applying the *Crawford* framework is whether the State is proffering "testimonial" hearsay evidence. Although the Court distinguished between testimonial and non-testimonial hearsay evidence in its opinion, it left "for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Crawford,* 124 S. Ct. at 1374. Despite this fact, we have little difficulty concluding that Sullivan's testimony from Jones's trial meets this definition. As the Court explained, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, *or at a former trial;* and to police interrogations." *Id.* (Emphasis added.)

¶ 54. Because Sullivan's hearsay evidence was "testimonial" in nature, we turn next to the require-

---

[8] Additionally, the Supreme Court reasoned that, "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law — as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Crawford,* 124 S. Ct. at 1374. As indicated below, however, the evidence in dispute falls under the category of "testimonial" hearsay, implicating core confrontation right concerns.

ments of the Confrontation Clause as interpreted by *Crawford:* (1) unavailability of the declarant and (2) a prior opportunity for cross-examination. *Id.* at 1374. In this case, the parties do not dispute the fact that Sullivan was unavailable. However, they do disagree as to whether Hale was properly afforded an opportunity to cross-examine Sullivan.

¶ 55.   The State maintains that the post-*Crawford* Confrontation Clause analysis may still be satisfied under the facts of this case. Specifically, it asserts that Hale had an opportunity to cross-examine Sullivan at codefendant Jones's trial through Jones's examination. According to the State, this "confrontation by proxy" is sufficiently reliable to pass constitutional muster because Jones had the same motive and interest as Hale to disavow Hale's participation in the charged crimes.

¶ 56.   Although the *Crawford* case does not directly address whether "confrontation by proxy" can satisfy the Confrontation Clause in the context of testimonial hearsay evidence, language in the opinion strongly suggests that it cannot. Throughout its decision, the Court repeatedly framed the requirement not simply in terms of the witness being cross-examined, but that "the defendant" have the opportunity to cross-examine the witness. Here, the defendant had no such opportunity.

¶ 57.   Another problem with the State's position is the Supreme Court's lamentation in *Crawford* that "[c]ourts have invoked *Roberts* to admit other sorts of plain testimonial statements despite the absence of any opportunity to cross-examine." *Id.* at 1372. One of the cases cited for this proposition is the court of appeals' decision in *State v. Bintz,* 257 Wis. 2d 177. There, two brothers, David and Robert, were tried separately for first-degree murder, party to a crime. *Id.,* ¶ 5. At

David's trial, a cellmate of his recounted statements that David had made, incriminating both himself and his brother. *Id.*, at ¶¶ 3–5. The cellmate died before Robert's trial, but his statements were nevertheless allowed into evidence under the former testimony hearsay exception. *Id.*, ¶ 5.

¶ 58.   We agree with Hale that the Supreme Court would not have considered *David* Bintz's opportunity for cross-examination to have satisfied *Robert* Bintz's confrontation right when it specifically denounced the case as an example of the abuses produced by the *Roberts* framework. Likewise, here, we determine that Jones's opportunity to cross-examine Sullivan does not satisfy Hale's confrontation right. We conclude that prior testimony may be admitted against a criminal defendant only when that defendant has had a prior opportunity to cross-examine the witness giving that testimony. Because Hale did not have the prior opportunity to cross-examine Sullivan, the admission of Sullivan's testimony violated Hale's constitutional right to confrontation.

## IV

¶ 59.   Having determined that Hale's right to confrontation was violated, we consider next whether the error warrants a new trial. Violation of the Confrontation Clause does not result in automatic reversal, but rather is subject to harmless error analysis. *Weed,* 263 Wis. 2d 434, 28 (quoting *State v. Williams,* 2002 WI 118, 2, 256 Wis. 2d 56, 652 N.W.2d 391).

¶ 60.   The test for this harmless error was set forth by the Supreme Court in *Chapman v. California,* 386 U.S. 18 (1967), *reh'g denied,* 386 U.S. 987 (1967).

There, the Court explained that, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24. An error is harmless if the beneficiary of the error proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*[9]

¶ 61. Although the *Chapman* standard is easy to state, it has not always been easy to apply. As a result, this court has articulated several factors to aid in the analysis, including the frequency of the error, the importance of the erroneously admitted evidence, the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence, whether the erroneously admitted evidence duplicates untainted evidence, the nature of the defense, the nature of the State's case, and the overall strength of the State's case. *State v. Norman,* 2003 WI 72, ¶ 48, 262 Wis. 2d 506, 664 N.W.2d 97; *State v. Billings,* 110 Wis. 2d 661, 668–70, 329 N.W.2d 192 (1983).

¶ 62. Hale contends that the admission of Sullivan's testimony contributed to the verdict obtained. He asserts that the key to the State's case was the .44 Magnum revolver and that Sullivan's testimony was necessary in determining that Hale had acquired

---

[9] At oral argument, both the State and defendant presented the test for harmless error as whether the error contributed to the verdict obtained. This is the test articulated in *Chapman v. California,* 386 U.S. 18 (1967), *reh'g denied,* 386 U.S. 987 (1967). In recent years, the United States Supreme Court and this court, while adhering to the *Chapman* test, have also articulated alternative wording. *See, e.g., Neder v. United States,* 527 U.S. 1, 2–3 (1999); *State v. Weed,* 2003 WI 85, ¶ 29, 263 Wis. 2d 434, 666 N.W.2d 485; *State v. Harvey,* 2002 WI 93, ¶ 48, n. 14, 254 Wis. 2d 442, 647 N.W.2d 189.

the gun before the crimes were committed. For support, Hale notes that the prosecution specifically referred to Sullivan's testimony twice during opening statements, four times during closing argument, and once again during rebuttal. Under such circumstances, Hale argues that the jury likely viewed Sullivan's testimony as crucial evidence of his guilt.

¶ 63.   Admittedly, Sullivan's testimony was referenced several times by the prosecutor at trial. However, we disagree with the characterization that his evidence was crucial. To begin, the nature of the references was brief. Moreover, Sullivan's testimony was not particularly important to the determination of Hale's guilt. This is because Sullivan was equivocal on the question of when he gave the gun to Hale. He stated that he was not sure and only "guess[ed]" that it was six months before Jones's trial in May 2002.[10]

¶ 64.   In any event, the jury did not need the testimony of Sullivan to hear how and when Hale acquired the murder weapon. Baker, Hale's girlfriend, testified that Hale obtained the gun from Sullivan about one week before the murders and had kept it on his person "a lot." She also stated that the murder weapon "looked like" the gun Hale had received. In this respect, the untainted evidence of Baker both corrobo-

---

[10] During direct examination, the following exchange took place concerning the timing of the transaction:

PROSECUTOR:   Okay. And what is your best estimate about the month or the time period when you gave him the gun? Do you know when that was?

SULLIVAN:   I don't know, about six months ago, I guess.

PROSECUTOR:   Okay. Was it before – was it in November of 2001?

SULLIVAN:   I'm not sure.

rated and duplicated Sullivan's testimony that Hale had obtained the gun before the double homicide. The closing argument of the prosecutor reflects this, noting, "David Sullivan in his read testimony here in court *confirms* Joy Baker in saying he did indeed provide a gun which looked like this gun." (Emphasis added).

¶ 65.  Hale's position is further undermined by the nature of his defense at trial. In closing argument, Hale's counsel summarized Sullivan's testimony as follows:  "During David Sullivan's—the reading of the testimony and the statement from David Sullivan, what you got is that he provided Glenn a gun about six months before, which was before that time, which would have been about the end of November, beginning of December. No one refuted that. *No one disputes that.*" (Emphasis added).

¶ 66.  The reason Hale did not dispute Sullivan's testimony was that it was irrelevant to his overall strategy. At trial, Hale invoked an alibi defense, essentially arguing that he could not have committed the crimes because he was at his grandfather's residence. During closing, his attorney explained this to the jury:

> Let's talk about our case. We didn't have to present anything. We didn't need to present anything. We didn't need to. Because when you filter though it all and you break it down, it's really simple. See, Glenn Hale was not that masked person. He was not there when the offenses were committed. He was at Vera Blalock and Milton Johnson Sr.'s house. *He did own that gun but other folks had access to it as well.*

(Emphasis added).

¶ 67.  Thus, Sullivan's testimony of how and when the gun was acquired by Hale became unimportant in light of the strategy of the defense. Hale conceded in

615

closing argument that the gun was given to him prior to the murders. Instead, his defense counsel argued that Hale had an alibi and that "other folks had access" to the gun given by Sullivan.

¶ 68.  As a result, the State needed to show much more than merely Hale's access to the murder weapon. The State needed to prove beyond a reasonable doubt that Hale was in fact the masked gunman. Although the nature of its case was circumstantial, the evidence it produced was overwhelming.

¶ 69.  A brief review demonstrates the strength of the State's case against Hale. As noted above, Bernhardt, the surviving victim, identified codefendant Jones as one of the perpetrators. Jones was married to Hale's sister and was living with Hale. On December 8, 2001, Hale and Jones were together one-half hour before the double homicide. They then went to Hale's grandfather's residence where they talked privately in the bathroom and then left together.

¶ 70.  Hale, short in stature, was wearing a black coat with a hood that police later found in the car when they were led on a high-speed chase. Bernhardt testified that Jones's accomplice, the gunman, was short, wearing a black ski mask, black sweater, and black gloves, wielding a worn looking revolver.

¶ 71.  After the shooting, Bernhardt went to a bathroom window and saw the perpetrators leave in a car whose profile resembles a 1989 Chevy Berretta. Two days later, a black 1989 Chevy Corsica, which looks like the Berretta in profile, was parked at the residence of Hale's mother. The crime scene was close enough to the residence of Hale's grandfather that Hale could have committed the crimes and returned within 15 minutes afterwards.

¶ 72.  For several days after the double homicides, Hale and his girlfriend Baker lived in a hotel and drove a rental car. When Hale picked up Baker after work on December 14, 2001, six days after the homicide, police tried to stop them. Hale drove away and led police on a high-speed chase from Kenosha to Milwaukee with speeds in excess of 100 miles per hour. In Milwaukee, Hale jumped from the driver's seat of the moving car and took off running before police caught him.

¶ 73.  In Hale's rental car, police found a fully loaded .44 Magnum revolver beneath the driver's seat. The parties stipulated that this was the murder weapon in the double homicide. Also in the car were a shoulder holster for the gun, loose bullets, a black hooded jacket, and a police scanner.

¶ 74.  Baker, who was in the front passenger seat during the car chase, said she helped Hale unstrap the shoulder holster. She testified that Hale had told her to toss the gun and bullets out the window, but she decided to put them under the seat instead. Baker said Hale got the gun from Sullivan a few days before the double homicide and wore it "a lot." She also testified that during the chase, Hale told her that it "would be probably his last time seeing [her]" and "to write him in jail."

¶ 75.  Shortly before the double homicide, Baker said that Hale had purchased a black ski mask. After his arrest, Hale told her that he had hidden the ski mask under the "plastic bottom" of her duffel bag and instructed her to "get rid" of it, which she and another woman ultimately did.

¶ 76.  After Hale was taken to jail, the police found black gloves stuffed behind the seat of the squad car where he had been sitting. At one point after his arrest,

Hale, teary eyed, told a detective "man if I did it, I just don't remember." He then repeated that statement to another detective.

¶ 77. Finally, Hale confessed the double homicide to fellow inmate James Toy in details that mimicked survivor Bernhardt's account and were not reported by the media. Given this evidence, along with the above-mentioned factors, we agree with the State that it is clear "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman,* 386 U.S. at 24.

## V

¶ 78. In sum, we agree with Hale that the testimony in question should not have been admitted in this case. Such evidence violated Hale's right to confrontation, as he did not have a prior opportunity to cross-examine the witness. However, we also conclude that it is beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained and was therefore harmless. Accordingly, albeit with different rationale, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 79. SHIRLEY S. ABRAHAMSON, C.J. *(concurring).* I join the majority opinion. I write separately not to solve the riddle of harmless error that again confounds the court, but to help decipher a particular aspect of the riddle.[1] As I have written previously, the doctrine of harmless error is a work in progress.[2]

---

[1] Roger J. Traynor, *The Riddle of Harmless Error* (1970).

[2] *State v. Harvey,* 2002 WI 93, ¶ 68, 254 Wis. 2d 442, 647 N.W.2d 189 (Abrahamson, C.J., dissenting).

¶ 80.  I agree with the majority opinion that the applicable test for harmless error in the present case is the one set forth in *Chapman v. California,* 386 U.S. 18 (1967), namely, that an error is harmless if the beneficiary of the error proves beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.[3]

¶ 81.  Footnote 9 of the majority opinion recognizes that some members of the court view the articulation of harmless error in *Neder v. United States,* 527 U.S. 1, 2–3 (1999), as replacing the *Chapman* test, or at least restating it in a substantively different way. This court has interpreted the *Neder* test as stating that if it is clear beyond a reasonable doubt that a rational jury would have convicted absent the error, then the error did not contribute to the verdict.[4]

---

[3] *See* majority op., ¶ 60.

[4] *See, e.g., State v. Weed,* 2003 WI 85, ¶ 29, 263 Wis. 2d 434, 666 N.W.2d 485 (if it is clear beyond a reasonable doubt that a rational jury would have convicted absent the error then the error did not contribute to the verdict); *State v. Carlson,* 2003 WI 40, ¶ 46, 261 Wis. 2d 97, 661 N.W.2d 51 (error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error); *State v. Gary M.B.,* 2004 WI 33, ¶¶ 39, 42, 270 Wis. 2d 62, 676 N.W.2d 475 (Crooks, J., concurring) (same); *State v. Harvey,* 2002 WI 93, ¶¶ 50–52, 254 Wis. 2d 442, 647 N.W.2d 189 (Crooks, J., concurring) (same).

For a discussion of *Neder v. United States,* 527 U.S. 1 (1999), and harmless error, see 5 Wayne R. LaFave et al., *Criminal Procedure* § 27.6(e), at 224–26 (2d ed. Supp. 2004).

According to Professor LaFave, "The *Chapman* standard clearly rejected a 'correct result' test, especially if the correct result was to be measured simply by sufficient evidence to sustain a conviction. The standard looked not to whether the jury could have convicted without regard to the error . . . but to

¶ 82. In several criminal cases before this court the State has avoided taking a position on whether the *Neder* and *Chapman* tests are the same or different. The State frequently asserts that whichever test is used, the error in that particular case was harmless. In a recent oral argument the State took the position that the *Neder* articulation of the harmless error test was somewhat different from the *Chapman* harmless error test, and that the *Neder* test was somewhat easier for the State to meet in that case.

¶ 83. I agree that the *Neder* test applies in cases involving a fact situation like that in *Neder.* Our court has so held (over my dissent).[5] I have written previously that I view *Neder* as limited to *Neder*-type cases. Different errors may call for different harmless error tests.

¶ 84. Whether the *Neder* test is the test of general application for non-*Neder*-type cases continues to be debated by members of the court. Thus footnote 9. This case is not the first case, nor will it be the last case, in which the issue of the correct articulation of the harmless error test, let alone the correct application of the test, is posed.

¶ 85. For the reasons set forth, I write separately.

¶ 86. JON P. WILCOX, J. (*concurring*). I write

whether the error had influenced the jury in reaching its verdict. . . . The *Chapman* opinion did not clearly indicate, however, precisely what weight was to be given to the presence of overwhelming untainted evidence in making that judgment. . . . In subsequent opinions, the Court has appeared to move back and forth between relying heavily upon the presence of proof of guilt in its harmless error analysis, and considering that proof as less central to the inquiry." 5 Wayne R. LaFave et al., *Criminal Procedure* § 27.6(e), at 958–59 (2d ed. 1999).

[5] *Harvey,* 254 Wis. 2d 442, ¶¶ 35–47.

separately because the majority refers to a debate that was settled three years ago. Some justices suggest that the test for harmless error set forth in *Neder v. United States,* 527 U.S. 1, 18 (1999), is an "alternative wording" of the harmless-error test in *Chapman v. California,* 386 U.S. 18 (1967), majority op., ¶ 60 n.9, and would like to apply the test for harmless error as set forth in *Chapman.* Majority op., ¶¶ 60–61.

¶ 87.   In *State v. Harvey,* 2002 WI 93, ¶ 47, 254 Wis. 2d 442, 647 N.W.2d 189, this court adopted the *Neder* formulation of the harmless error test for constitutional errors. In doing so we noted:   "The Court's use of somewhat different language in restating the test can be viewed as a further clarification of what it takes to meet the test; that is, that in order to conclude that an error 'did not contribute to the verdict' within the meaning of *Chapman,* a court must be able to conclude 'beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " *Id.,* ¶ 48 n.14 (quoting *Neder,* 527 U.S. at 18). The result of *Harvey* was that "the harmless error dispute [was] finally put to rest in Wisconsin, at least in criminal cases." *Id.,* ¶ 51 (Crooks, J., concurring).

¶ 88.   In *State v. Weed,* 2003 WI 85, ¶¶ 28–29, 263 Wis. 2d 434, 666 N.W.2d 485, this court applied the *Neder* formulation of harmless error to a supposed Confrontation Clause violation. We noted that the *Neder* test was not a sufficiency of the evidence test and reaffirmed our explanation in *Harvey* that *Neder* refined the *Chapman* test for harmless error. *Id.* "In other words, if it is 'clear beyond a reasonable doubt that a rational jury would have convicted absent the error' then the error did not ' "contribute to the verdict." ' " *Id.,* ¶ 29 (quoting *Neder,* 527 U.S. at 15, 18). Recently, the Seventh Circuit Court of Appeals indicated that the

*Neder* formulation of harmless error is applicable to Confrontation Clause violations post-*Crawford v. Washington,* 541 U.S. 36 (2004). *United States v. Gilbert,* 391 F.3d 882, 884 (7th Cir. 2004).

¶ 89. Therefore, I would continue to apply the *Neder* formulation of harmless error to Confrontation Clause violations in the aftermath of *Crawford.* Because the majority reverts back to the *Chapman* formulation of harmless error without the refinements of *Neder,* and in doing so reopens a debate that was definitely settled by this court in *Harvey* and *Weed,* I respectfully concur.

¶ 90. I am authorized to state that Justices N. PATRICK CROOKS and DAVID T. PROSSER, JR. join this concurrence.

¶ 91. DAVID T. PROSSER, J. (*concurring*). This case, which follows in the wake of *Crawford v. Washington,* 541 U.S. 36, 124 S. Ct. 1354 (2004), affirms the principle that out-of-court "testimonial" statements by witnesses are barred from criminal trials by the Confrontation Clause of the Sixth Amendment unless the witnesses are "unavailable" and the defendants against whom the statements are to be used have had a prior opportunity to cross-examine the witnesses. This exclusion of evidence applies irrespective of whether the statements are "reliable."

¶ 92. I join the majority opinion articulating this principle but write separately to emphasize that the principle has at least one major exception. As the *Crawford* court noted, "the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining

reliability." *Id.,* 124 S. Ct. at 1370, (citing *Reynolds v. United States,* 98 U.S. 145, 158–59 (187[8])).

¶ 93.   The exception thus stated is essential because it discourages defendants from killing, kidnapping, secreting, terrorizing, blackmailing, or conspiring with critical witnesses so that they become unavailable to testify. "The rule has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong." *Reynolds,* 98 U.S. at 159. "It is the outgrowth of a maxim based on the principles of common honesty, and, if properly administered, can harm no one." *Id.*

¶ 94.   Because the effect of the *Crawford* decision is to exclude certain testimonial hearsay that heretofore was thought to be admissible, it is vital for courts to enforce the exception to assure the integrity of criminal trials.

¶ 95.   There is a great deal of authority supporting the principle that a defendant forfeits the constitutional right to confrontation by wrongdoing or misconduct causing the absence of a witness. This bedrock principle has been accepted by every court that has considered it. *See, e.g., United States v. Dhinsa,* 243 F.3d 635, 651–52 (2d Cir. 2001); *United States v. Cherry,* 217 F.3d 811, 814–15 (10th Cir. 2000); *United States v. Emery,* 186 F.3d 921, 927 (8th Cir. 1999); *United States v. White,* 116 F.3d 903, 911 (D.C. Cir. 1997); *United States v. Houlihan,* 92 F.3d 1271, 1278–79 (1st Cir. 1996); *Steele v. Taylor,* 684 F.2d 1193, 1199 (6th Cir. 1982); *United States v. Rivera,* 292 F. Supp. 2d 827, 830 (E.D. Va. 2003); *People v. Giles,* 19 Cal. Rptr. 3d 843, 847–48 (Cal. Ct. App. 2004); *People v. Pantoja,* 18 Cal. Rptr. 3d 492, 499 n.2 (Cal. Ct. App. 2004); *State v. Hallum,* 606 N.W.2d 351, 355–56 (Iowa 2000); *State v. Fields,* 679 N.W.2d 341, 347 (Minn. 2004); *People v.*

*Salazar,* 688 N.Y.S.2d 401, 403–04 (N.Y. Sup. Ct. 1999); *see also* 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 507.1 (2d ed. Supp. 2003).

¶ 96.   Most jurisdictions require that the prosecution prove the defendant's wrongdoing by a preponderance of the evidence. *Emery,* 186 F.3d at 927; *White,* 116 F.3d at 912; *Houlihan,* 92 F.3d at 1280; *Steele,* 684 F.2d at 1201; *Rivera,* 292 F. Supp. 2d at 831; *Hallum,* 606 N.W.2d at 355–56. A few courts use the "clear and convincing evidence" standard of proof. *U.S. v. Thevis,* 665 F.2d 616, 631 (5th Cir. 1982); *Giles,* 19 Cal. Rptr. 3d at 848.

¶ 97.   The principle of forfeiture by wrongdoing has become so well accepted that in 1997, it was codified in the Federal Rules of Evidence:

> Rule 804. Hearsay Exceptions; Declarant Unavailable
>
> (b) Hearsay exceptions.
>
> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (6) Forfeiture by wrongdoing. A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.

In recommending addition of the "forfeiture by wrongdoing" exception to the hearsay rule, the Advisory Committee on Rules noted that every federal circuit to consider the issue has recognized the exception, with most using a preponderance of the evidence standard to prove the misconduct. The Committee commented:

> Subdivision (b)(6). Rule 804(b)(6) has been added to provide that a party forfeits the right to object on

hearsay grounds to the admission of a declarant's prior statement when the party's deliberate wrongdoing or acquiescence therein procured the unavailability of the declarant as a witness. This recognizes the need for a prophylactic rule to deal with abhorrent behavior "which strikes at the heart of the system of justice itself." *United States v. Mastrangelo,* 693 F.2d 269, 273 (2d Cir. 1982), *cert. denied,* 467 U.S. 1204 (1984). The wrongdoing need not consist of a criminal act. The rule applies to all parties, including the government.

Every circuit that has resolved the question has recognized the principle of forfeiture by misconduct, although the tests for determining whether there is a forfeiture have varied. *See, e.g., United States v. Aguiar,* 975 F.2d 45, 47 (2d Cir. 1992); *United States v. Potamitis,* 739 F.2d 784, 789 (2d Cir.), *cert. denied,* 469 U.S. 918 (1984); *Steele v. Taylor,* 684 F.2d 1193, 1199 (6th Cir. 1982), *cert. denied,* 460 U.S. 1053 (1983); *United States v. Balano,* 618 F.2d 624, 629 (10th Cir. 1979), *cert. denied,* 449 U.S. 840 (1980); *United States v. Carlson,* 547 F.2d 1346, 1358–59 (8th Cir.), *cert. denied,* 431 U.S. 914 (1977). The foregoing cases apply a preponderance of the evidence standard. *Contra United States v. Thevis,* 665 F.2d 616, 631 (5th Cir.) (clear and convincing standard), *cert. denied,* 459 U.S. 825 (1982). The usual Rule 104(a) preponderance of the evidence standard has been adopted in light of the behavior the new Rule 804(b)(6) seeks to discourage.

Notes of Advisory Committee on Rules—1997 Amendments to Federal Rules of Evidence.

¶ 98.   To sum up, corrupt efforts to preclude the testimony of witnesses cannot be permitted to succeed. It is incumbent upon courts to enforce this principle in the post-*Crawford* era.

¶ 99.   I am authorized to state that Justices JON P. WILCOX and PATIENCE D. ROGGENSACK join this concurrence.

¶ 100. LOUIS B. BUTLER, JR., J. (*concurring*). I concur with the decision and the mandate of the court. I agree with the court's interpretation and analysis of the Confrontation Clause under the facts of this case. While I disagree with the majority's statement of the harmless error test, I agree with its application of the harmless error analysis in this case. I also conclude that the State met its burden beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. I write separately because of the majority's decision not to discuss whether the prior testimony in this case was admissible under a recognized hearsay exception. I also write separately to discuss this court's misstatement of the harmless error rule.

I

¶ 101. While the confrontation issue may indeed be easy to resolve in this case, the hearsay question is equally easy to resolve. The evidence in this case was not admissible under either the former testimony exception or the residual exception to the hearsay rule.

¶ 102. Wisconsin Stat. § 908.045(1) excludes from the hearsay rule, provided the declarant is unavailable as a witness:

> Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of another proceeding, at the instance of or against a party with an opportunity to develop the testimony by direct, cross-, or redirect examination, with motive and interest similar to those of the party against whom now offered.

¶ 103. David Sullivan testified at the trial of co-defendant Robert Jones. Sullivan testified that he had given a gun to Hale, not Jones, shortly before the

murders. During Jones' trial, Sullivan expressed fear in testifying and guilt in providing the murder weapon to Hale. Later, when subpoenaed for the Hale trial, Sullivan simply disappeared. Yet the trial court admitted Sullivan's testimony during the Jones' trial against Hale in Hale's trial, under the theory that Jones' cross-examination in his trial could be admitted against Hale because Jones possessed a motive and interest similar to Hale.

¶ 104. It is important to note here that Jones' cross-examination of Sullivan took the gun out of Jones' possession and placed it in Hale's possession. Jones was minimizing his involvement at the expense of Hale through his cross-examination. Jones identified Hale as the shooter in a statement to the police prior to the trial. Hale, according to the trial court, made statements implicating Jones. Indeed, Jones and Hale had antagonistic defenses. *Compare State v. Nutley,* 28 Wis. 2d 527, 543, 129 N.W.2d 155 (1964).

¶ 105. A motion to sever was filed by Hale. The State conceded that severance was required. The court agreed, ordering separate trials for Hale and Jones. Under these facts, and given this procedural posture, there can be no misstating the interests and motives of these two individuals as being similar. Jones was clearly putting the blame on Hale and used Sullivan's testimony to further that purpose. Jones and Hale were pointing fingers toward each other. The trial court should not have admitted that testimony as former testimony under Wis. Stat. § 908.045(1), as their motives and interests were certainly not similar.

¶ 106. I also disagree with the court of appeals that Sullivan's testimony was admissible under the "residual hearsay exception" of Wis. Stat. § 908.045(6). Section 908.045(6) excludes from the hearsay rule,

627

provided the declarant is unavailable as a witness, "[a] statement not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness."

¶ 107.   This exception "is for the novel or unanticipated category of hearsay that does not fall under one of the named categories, but which is as reliable as one of those categories." *State v. Stevens,* 171 Wis. 2d 106, 120, 490 N.W.2d 753 (Ct. App. 1992). Accordingly, "[i]t is intended that the residual hearsay exception rule will be used very rarely, and only in exceptional circumstances." *Id.* The State has failed to identify how this case is novel or exceptional. Nor has the State clearly established comparable circumstantial guarantees of trustworthiness, particularly in light of the antagonistic defenses between Jones and Hale. The shooter was not positively identified at the scene, and the gun can be traced back to Sullivan. Thus, Sullivan had ample reason to place the gun in someone else's hands. Consequently, there was no sufficient showing of particularized guarantees of trustworthiness in this case.

## II

¶ 108.   In ¶¶ 60–61 of its opinion, the majority properly states the Chapman[1] harmless error test. In footnote 9, however, the majority notes that while adhering to the *Chapman* test in recent years, the United States Supreme Court and this court have articulated alternative wording for the test. While the majority is correct that there are alternative wordings for the harmless error test, the different wordings make all the difference. The alternative wordings, although

---

[1] *Chapman v. California,* 386 U.S. 18 (1967), *reh'g denied,* 386 U.S. 987 (1967).

all falling under the umbrella of harmless error, are fundamentally different tests that depend on the nature of the error and are not interchangeable.

¶ 109. The Court in *Chapman* made it clear that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967), *reh'g denied*, 386 U.S. 987 (1967). An error is harmless if the beneficiary of the error proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* This is the basic test that is applied to most constitutional violations that occur during a criminal trial, but not all of them.

¶ 110. Certain types of errors are "structural" in nature, and are considered so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case. *Id.* at 23 n. 8; *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986); *Neder v. United States*, 527 U.S. 1, 8 (1999). These errors include a complete denial of counsel,[2] a biased trial judge,[3] racial discrimination in the selection of a grand jury,[4] denial of self-representation at trial,[5] denial of a public trial,[6] and a defective reasonable-doubt instruction.[7] *Neder*, 527 U.S. at 8.

¶ 111. Most constitutional errors are analyzed using the basic harmless error test set forth in *Chap-*

---

[2] *Johnson v. United States*, 520 U.S. 461, 468 (1997)(citing *Gideon v. Wainwright*, 372 U.S. 335 (1963)).

[3] *Tumey v. Ohio*, 273 U.S. 510 (1927).

[4] *Vasquez v. Hillery*, 474 U.S. 254 (1986).

[5] *McKaskle v. Wiggins*, 465 U.S. 168 (1984).

[6] *Waller v. Georgia*, 467 U.S. 39 (1984).

[7] *Sullivan v. Louisiana*, 508 U.S. 275 (1993).

*man.* Whether such an error is harmless depends on a number of factors, all accessible to reviewing courts. *Van Arsdall,* 475 U.S. at 684 (confrontation violation). *Compare, e.g., Fahy v. Connecticut,* 375 U.S. 85 (1963) (illegally seized evidence); *Gilbert v. California,* 388 U.S. 263 (1967) (illegally seized evidence); *Satterwhite v. Texas,* 486 U.S. 249 (1988) (right to consult with counsel); *Arizona v. Fulminante,* 499 U.S. 279 (1991) (involuntary confessions); and *Chapman,* 386 U.S. 18 (comments on defendant's silence). For these types of errors, the analysis begins with an evaluation of the nature of the error and the harm it is alleged to have caused in order to determine whether the error did not contribute to the verdict obtained beyond a reasonable doubt. *State v. Weed,* 2003 WI 85, ¶ 30, 263 Wis. 2d 434, 666 N.W.2d 485; *State v. Carlson,* 2003 WI 40, ¶ 87, 261 Wis. 2d 97, 661 N.W.2d 51 (Sykes, J., dissenting). The appropriate standard is not whether there is sufficient evidence, absent the error, to support the verdict. *Weed,* 163 Wis. 2d, ¶¶ 28–32. Nor does the defendant have to show "outcome determinative" prejudice in order to state a violation. *Van Arsdall,* 475 U.S. at 679–80.

¶ 112.  Certain types of constitutional errors by their very nature lend themselves to a form of an "outcome determinative" approach. One such error involves ineffective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668 (1984). The Court in *Strickland* held that in order to challenge the conviction on the grounds of ineffective assistance of counsel, a defendant would have to show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Id.* at 687. In discussing the nature of the error, the Court determined that it is not enough to show that the error had some conceivable outcome of the proceeding, as virtually every act or omission of

counsel would meet that test. *Id.* at 693. But the Court refused to adopt a strict "outcome determinative" approach that the defendant would have to show that counsel's deficient conduct more likely than not altered the outcome of the case. *Id.* Instead, the Court adopted a modified outcome approach, that the defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* This test shifts the burden to the defendant and is considerably different than the reasonable possibility standard set forth in *Chapman.*

¶ 113. Similarly, the United States Supreme Court has, on more than one occasion, adopted a form of "outcome determinative" harmless error standard in matters involving errors in jury instructions. In *Neder,* the Court examined whether the failure to instruct the jury on an uncontested element of the offense could be harmless error. The Court concluded that where a defendant did not and could not bring forth facts contesting the omitted element, "answering the question whether the jury verdict would have been the same absent the error does not fundamentally undermine the purposes of the jury trial guarantee." *Neder,* 527 U.S. at 19. *See also, Pope v. Illinois,* 481 U.S. 497 (1987); *Yates v. Evatt,* 500 U.S. 391 (1991). The Court explained in *Yates* that when dealing with presumptions in jury instructions, one cannot look subjectively into the minds of the jurors. *Id.* at 404–05. A court must approach the inquiry by asking whether the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in

the absence of the presumption. *Id.* The Court once again focused on the nature of the error in determining whether the error was harmless.

¶ 114.  The proper harmless error test for a confrontation violation was set forth in *Van Arsdall.* The Court specifically rejected an outcome determinative test for this type of violation, distinguishing its approach in *Strickland. Van Arsdall,* 466 U.S. at 679–80. As the focus of the Confrontation Clause centers on an individual witness, the focus of the prejudice inquiry must be on the particular witness, not the outcome of the entire trial. *Id.* at 680. Factors to consider include the importance of the testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *Id.* at 684. While the majority here does not cite *Van Arsdall,* it is nevertheless clear that it essentially applies *Van Arsdall.* See majority op., ¶ 61.

¶ 115.  This court has merged the harmless error analysis for trial constitutional errors into one standard. *Compare State v. Dyess,* 124 Wis. 2d 525, 540–47, 370 N.W.2d 222 (1984) (concluding that "reasonable probability" means essentially the same thing as "reasonable possibility"); with *State v. Harvey,* 2002 WI 93, ¶ 46, 254 Wis. 2d 442, 647 N.W.2d 189 (concluding that the Court in *Neder* applies the harmless error test in the same manner, regardless of the nature of the error complained of). *See also, id.,* ¶¶ 50–52 (Crooks, J., concurring). This construction of the harmless error

test is flawed.[8] The harmless error analysis must depend upon the nature of the error. Some errors can never be harmless, some will have to be evaluated under the *Chapman* "reasonable possibility" test, and some will have to be viewed in terms of the outcome absent any error.

¶ 116.   We should not try to fit a "square peg" into a "round hole." This court will necessarily have to struggle with the application of the harmless error analysis in light of the error. Because the majority in this matter has essentially, but appropriately, adopted the factors set forth in *Van Arsdall*,[9] and because the

---

[8] Some of the confusion may stem from language in *Neder*, where the Court suggests that the harmless error inquiry for failure to instruct the jury on an uncontested element "must be essentially the same" as the inquiry for the erroneous exclusion of evidence in violation of the Fifth Amendment guarantee against self-incrimination and the Sixth Amendment right to confront witnesses. *Neder v. United States,* 527 U.S. 1, 18 (1999). One writer suggests that the Court is split 5–4 on whether to apply an "overwhelming evidence" standard as opposed to looking at the effect of the error on the jury. Jeffrey O. Cooper, *Searching for Harmlessness:   Method and Madness in the Supreme Court's Harmless Constitutional Error Doctrine,* 50 Kan. L. Rev. 309, 324 (2002). While the Court may be divided, and may be moving in the direction of looking at the strength of the evidence in evaluating harmless error, it appears to have used an outcome approach only in cases involving ineffective assistance of counsel or jury instruction errors, the language in *Neder* notwithstanding.

[9] The Seventh Circuit Court of Appeals apparently has the same difficulty that the majority has in applying harmless error with a confrontation violation. In *United States v. Gilbert,* __ F.3d __, No. 03–3365–CR (7th Cir. 2004), the court frames the harmless error analysis as "whether it is clear beyond a reasonable doubt that a rational jury would have found Gilbert guilty even absent the admission of Sherese's statement." *Id.* at __.

error in this case was harmless beyond a reasonable doubt in light of those factors, I agree with and join the decision rendered here today.

## III

¶ 117.   I join the decision and the mandate of the court because it correctly interprets the Confrontation Clause of the United States Constitution while protecting the face-to-face requirements of the Wisconsin Constitution. While the majority misidentifies the appropriate harmless error test to be applied in a confrontation violation, it correctly applies the harmless error analysis to facts of this case. Let there be no doubt, however, regarding the admissibility of Sullivan's "former testimony" during Hale's trial—that testimony clearly did not fall within a hearsay exception and should not have been admitted into evidence against Hale.

¶ 118.   For the foregoing reasons, I respectfully concur.

Yet, without saying so, the court also appears to apply a *Van Arsdall*-type analysis. The court reasoned that the erroneously admitted evidence was the most probative. *Id.* at __. Absent that evidence, the court could not determine whether the jury would credit other testimony, or whether other evidence, if credited, would be sufficient. *Id.* The prosecution argued that this was the most and perhaps the only probative evidence that was offered on the issue of possession. *Id.* The court concluded that, in light of the evidence as a whole, it could not determine that the jury would have returned a guilty verdict absent the error. *Id.* The focus was clearly on the nature of the error and its impact on the jury.