**2020 WI App 58**

# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:          2018AP1897-CR

† Petition for Review Filed

Complete Title of Case:

**STATE OF WISCONSIN,**

            **PLAINTIFF-RESPONDENT,**

      **V.**

**MORGAN E. GEYSER,**

            **DEFENDANT-APPELLANT.†**

| | |
|---|---|
| Opinion Filed: | August 12, 2020 |
| Submitted on Briefs: | October 10, 2019 |

| | |
|---|---|
| JUDGES: | Neubauer, C.J., Reilly, P.J., Gundrum, J. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Matthew S. Pinix* of *Pinix & Soukup, LLC*, Milwaukee. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Joshua L. Kaul*, attorney general, and *Katherine D. Lloyd*, assistant attorney general. |
| Non party ATTORNEYS: | A nonparty brief was filed by *Randall E. Paulson* of *Paulson Law Office*, Milwaukee, and *Marsha L. Levick* of Philadelphia, Pennsylvania, for *Juvenile Law Center*. |

**COURT OF APPEALS
DECISION
DATED AND FILED**

**August 12, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP1897-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. **2014CF596**

**IN COURT OF APPEALS**

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

MORGAN E. GEYSER,

DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Waukesha County: MICHAEL O. BOHREN, Judge. *Affirmed.*

Before Neubauer, C.J., Reilly, P.J., and Gundrum, J.

¶1 GUNDRUM, J. On May 31, 2014, twelve-year-old Morgan Geyser, with the aid of twelve-year-old Anissa Weier, repeatedly stabbed her friend, the twelve-year-old victim in this case. Geyser's attack brought the victim to the brink of death, but she very fortunately survived. As a result of the attack, Geyser and

Weier were charged in adult court with attempted first-degree intentional homicide, with use of a dangerous weapon, as parties to the crime.

¶2    A preliminary hearing was held to determine whether probable cause existed that Geyser and Weier had committed that adult-court-jurisdiction-conferring offense and thus whether the matter should remain in adult court. Despite the efforts of Geyser and Weier to convince the court the charge should be reduced to attempted second-degree intentional homicide—resulting in a loss of exclusive original adult-court jurisdiction—the court found probable cause that both defendants committed attempted first-degree intentional homicide and bound them over for trial in adult court. In this appeal, Geyser claims the court erred in binding her over rather than discharging her from adult court. We conclude the court did not err.

¶3    As the case was pending, Geyser filed a motion to suppress a statement she made to Waukesha Police Department Detective Thomas Casey following the attack.[1] She claimed, and claims on appeal, that she did not knowingly, intelligently, and voluntarily waive her *Miranda*[2] rights prior to providing this statement, and thus the statement was unconstitutionally procured,

---

[1] In her suppression motion, Geyser also challenged incriminating comments she made to Waukesha County Lieutenant Paul Renkas at the time of her arrest. On appeal, she is a bit vague as to precisely which statement(s) to law enforcement she is referring to in her appellate briefing. It seems clear from the totality of her arguments, however, that she is challenging the statement she made to Detective Thomas Casey as all of the arguments she develops relate to her statement to Casey, and she fails to develop any arguments related to her comments to Renkas or any other comments she made to law enforcement. Thus, she has abandoned her challenge related to her comments to Renkas and forfeited any potential challenge to other comments she made to law enforcement. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) ("[A]n issue raised in the trial court, but not raised on appeal, is deemed abandoned."); *Schill v. Wisconsin Rapids Sch. Dist.*, 2010 WI 86, ¶45 & n.21, 327 Wis. 2d 572, 786 N.W.2d 177 (issues not raised in the circuit court are generally forfeited).

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

and the circuit court erred in declining to suppress it. We need not decide whether the court erred in denying this motion because we conclude that even if it did err, such error was harmless beyond a reasonable doubt due to the additional, unchallenged and overwhelming evidence in this case.

## Background

¶4    The following evidence was presented at the preliminary hearing.

¶5    Detective Michelle Trussoni of the Waukesha Police Department testified as to her interview of accomplice Weier following the attack. Weier told Trussoni that she and Geyser had engaged in significant planning to kill the victim for months leading up to the attack, and Geyser had decided, and Weier agreed, they would kill the victim in conjunction with a birthday sleepover at Geyser's house May 30 through May 31, 2014. Weier told Trussoni about a fictional internet character named Slenderman and that prior to the attack, Geyser had told Weier they needed to become "proxies" of Slenderman and could do so by killing the victim. Although Weier "struggled with" the decision to kill the victim, "she really wanted to prove the skeptics wrong and … prove herself worthy of Slenderman."

¶6    Geyser came up with the original murder plan, which was for her and Weier to wake up around 2:00 a.m. during the sleepover, put duct tape over the victim's mouth, and "stab [her] in the neck and she would bleed out." They ended up not attacking the victim during the night, but in the morning agreed they would kill her at the park by stabbing her in one of the bathroom stalls. They chose the bathroom because "the blood would then drain down into the … floor drain," and they "could close the door to the stall, nobody would know [the victim] was in there." After killing the victim, they would begin a trek to Nicolet National Forest in Northern Wisconsin to live with Slenderman.

¶7      The morning of the sleepover the three girls left Geyser's home and headed for the park, but before doing so, Geyser took a knife, which she showed to Weier on the way to the park. Once in the bathroom at the park, Geyser gave Weier the knife. Geyser grabbed the victim's arms from behind, but Weier was "too squeamish" to stab the victim. Weier struck the victim in the head, attempting to "knock her out," and subsequently made an excuse to the victim for striking her. All three eventually left the bathroom and went for a walk in the woods. Geyser and Weier agreed they would attack the victim there.

¶8      They began to "play" hide-and-seek in the woods. Geyser and Weier agreed that Geyser would stab the victim when Weier told her to. Weier subsequently stated, "[D]o it now" and "go ballistic, go crazy," or something similar, at which point Geyser began stabbing the victim repeatedly. They left the victim in the woods, and as they walked from the area, Geyser told Weier she believed she stabbed the victim seventeen times.

¶9      Detective Shelley Fisher testified to her interview of the victim a week after the attack. The victim told Fisher that she, Geyser, and Weier all slept over at Geyser's house in celebration of Geyser's birthday. After breakfast, Geyser suggested they go to the park. Geyser packed a bag with food, as well as some pictures, which the victim found to be "somewhat unusual … just to go to the park." After playing at the park for a while, they went into the bathroom, where Weier struck the victim's head, causing it to hit the wall. Next, Geyser told the victim and Weier to go into the bathroom stall to look at some vandalism, and when all three were in the stall, Geyser locked the door. Geyser said there really was no vandalism and then held the victim's arms back. Weier was in front of the victim, but nothing happened, prompting Geyser to say to Weier, "I thought we agreed you were going to do this" and "I need to talk to you in the next stall." Geyser and Weier went into

4

the next stall to talk. They came back into the stall with the victim, and this time Weier held the victim's arms back while Geyser was in front of the victim, staring at her and "her arm was rubbing the large bag that she had brought with her." Nothing more happened, so Weier told the victim to go out to the park and play, which the victim did.

¶10 Geyser and Weier emerged from the bathroom several minutes later. Geyser suggested the three take a walk in the woods, and once in the woods, Weier suggested they play hide-and-seek. While "hiding" with the victim, Weier directed the victim to lay on the ground, which she did. Moments later, Geyser and Weier approached the victim. Geyser sat on the victim's legs, brought her face real close to the victim's face, whispered "I'm so sorry" in the victim's ear, and then began repeatedly stabbing the victim and pushing her down during the attack. They told the victim they were going to go get help; they then ran away. A passerby later secured aid for the victim.

¶11 On cross-examination, Fisher testified that during her investigation she learned of no other incidents of violent actions by Geyser and that the victim indicated this was the only occasion on which Geyser had been violent toward her. Following the attack, Fisher also found a notebook in Geyser's school locker with drawings of Slenderman and a picture of a girl "holding a knife and there's blood dripping from the knife and there's blood on her clothing."

¶12 Washington County Correctional Officer Shelley Grunke testified that Geyser was brought to the Washington County Juvenile Detention Center several hours after the attack. As part of standard processing, Grunke asked Geyser if she "planned to do anything to end her life," to which Geyser responded, "not mine, no, not mine." With follow-up questions, Grunke learned that Geyser was

referring to her "best friend." Geyser stated, "[W]ell, she was my best friend," but "[s]he hates me now, but it had to be done." Geyser also indicated she had started planning to kill the victim in December 2013.

¶13 Casey testified to his interview of Geyser at the police department several hours after the attack. Geyser told Casey that she and Weier had been planning the attack for months and were initially planning to kill the victim in conjunction with Geyser's birthday sleepover. They originally planned to stab the victim in the middle of the night but did not follow through with that plan. They then planned to stab her in the bathroom at the park, but Geyser was "not present for most of it" and instead was "singing and walking around" during the bathroom encounter. Geyser stated Weier had "tried to knock [the victim's] head into the wall to knock her out," but that did not work. They then agreed to lure the victim into the woods, and the three went to the woods and began playing hide-and-seek. Geyser told Casey she and Weier both stabbed the victim but that Weier was the first person to do so.

¶14 Deborah Collins, a doctor of clinical psychology, testified on behalf of Geyser as to the mental health evaluation she completed of Geyser following the attack. She explained that she, as well as staff at the Winnebago Mental Health Institute where Geyser was being housed, had observed Geyser's "enduring predominant belief in … the reality of Slenderman" and other fictional characters. Geyser's belief in Slenderman had been constant, unwavering, and "unyielding to rational information, to an alternative perspective." With regard to the attack, Geyser expressed to Collins that she was "motivated to do the bidding of Slenderman" and "that had she not acted on behalf of Slenderman, he could have very well killed her or her family and that she didn't want to die." Collins reported that one of the doctors at Winnebago diagnosed Geyser with schizophrenia.

6

¶15 Based on the evidence presented at the hearing, the circuit court determined there were several "reasons that one could argue exist" for what motivated Geyser and Weier to attempt to kill the victim: a desire to "ingratiate" themselves to Slenderman and become a "proxy" of his, a desire to prove to "skeptics" that Slenderman was real, and their "belie[f] that Slenderman would kill their families if they did not kill" the victim. The court concluded that the affirmative defense of unnecessary defensive force, supporting attempted second-degree intentional homicide, had not been established and found probable cause to believe Geyser committed the charged offense of attempted first-degree intentional homicide.[3] The court then bound her over for trial.

¶16 Geyser subsequently moved to suppress the statement she made to Casey. She asserted that her due process rights were violated because she did not knowingly, intelligently, and voluntarily waive her *Miranda* rights prior to providing this statement.

¶17 At the evidentiary hearing on this motion, Waukesha County Lieutenant Paul Renkas testified that he located Geyser a few hours after the attack. Prior to doing a pat-down search of her, Renkas asked Geyser "if she had anything that would hurt me, sharp edges, needles, knives, et cetera," and Geyser told him there was a knife in her purse in the nearby tree line. Noticing blood on Geyser's clothes, he asked Geyser if she was injured; to which she responded that she was not. When Renkas asked her where the blood came from, she told him she was

---

[3] The circuit court found "specifically as to each defendant that the charge in the complaint that probable cause exists to believe that Ms. Weier and Ms. Geyser each attempted to kill [the victim] with the use of a dangerous weapon. That's a violation of [WIS. STAT. §] 940.01" (2017-18).

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

"forced to stab her best friend to death." Renkas asked Geyser what happened, and Geyser told him she "and another girl had stabbed a girl and they were forced to stab her."

¶18     Casey again testified as to the statement Geyser made at the police department. Geyser discussed with Casey her preattack plans and the attack itself, which discussion was eventually reduced to writing. Geyser signed the statement, which stated that she and Weier had started planning the previous December to kill the victim, they wanted to kill her "because it was '[n]ecessary,'" and they planned to do "it" during the sleepover. Geyser added: "We talked in December about duct taping [the victim] and stabbing her while she slept, but I didn't think it was a good idea. I was suppose to set the alarm for 2:30 a.m. but didn't." She stated that after waking up the morning of the sleepover, they played for a while and then went to the park; she acknowledged taking a knife from her kitchen. She stated that they played for a while at the park, went into the bathroom, and Weier "tried to knock [the victim] out." They then "tricked" the victim into going into the woods to play hide-and-seek. Geyser counted while Weier and the victim hid. Geyser further stated:

> Then I started to count again, but [Weier] jumped on [the victim]. Then "we stabbed her." "I don't really remember what happened next." I stabbed [the victim]. I didn't count how many times[.] [T]here was alot of blood. [Weier] said we would get help but we didn't.… We didn't do anything to help [the victim] … I tried to clean up her wounds with a large leaf. We left [the victim] there.

Following the attack, Geyser and Weier filled their water bottles at Walmart and "washed off the blood." They "wandered around" for a while and "hid because we saw the police," but the police found them. Geyser stated that "[t]he knife we stabbed [the victim] with" was inside her purse.

8

¶19   The circuit court denied Geyser's suppression motion, and she eventually pled to attempted first-degree intentional homicide with the use-of-a-dangerous-weapon enhancer struck. Upon stipulation by the State, she was found not guilty by reason of mental disease or defect. The court committed Geyser to the custody of the department of health services for a period not to exceed forty years. Geyser appeals.

## *Discussion*

¶20   Geyser argues the circuit court erred in maintaining adult court jurisdiction and binding her over for trial and in denying her motion to suppress her statement to Casey. On the first issue, we conclude the court did not err as it properly found probable cause that Geyser committed attempted first-degree intentional homicide. As to whether the court erred in denying her suppression motion, we do not decide the issue because even if the court did err, such error was harmless in light of the overwhelming additional evidence in this case.

Adult Court Jurisdiction

¶21   An adult criminal court in Wisconsin has exclusive original jurisdiction over a juvenile charged with first- or second-degree intentional homicide or, as in this case, attempted first-degree intentional homicide, but does not have such jurisdiction over a juvenile charged with attempted second-degree intentional homicide. *See* WIS. STAT. § 938.183(1)(am). When a juvenile is charged with any of those first three offenses, a preliminary hearing is generally held to "first determine whether there is probable cause to believe that the juvenile has committed the violation of which he or she is accused." WIS. STAT. § 970.032(1). "*If* the court does *not* make *that finding*, the court shall order that the

juvenile be discharged," although proceedings may be brought in juvenile court. *Id.* (emphasis added).

¶22    While we review de novo whether the evidence presented at the preliminary hearing was sufficient to support the circuit court's bindover decision and maintain adult court jurisdiction, *State v. Toliver*, 2014 WI 85, ¶24, 356 Wis. 2d 642, 851 N.W.2d 251, we "will search the record for any substantial ground based on competent evidence to support" the decision. *State v. Anderson*, 2005 WI 54, ¶26, 280 Wis. 2d 104, 695 N.W.2d 731 (citation omitted).

¶23    "A preliminary hearing as to probable cause is not a preliminary trial or a full evidentiary trial on the issue of guilt beyond a reasonable doubt. It is intended to be a summary proceeding to determine essential or basic facts as to probability." *Id.*, ¶24. For an adult charged in adult court, "the circuit court must 'bind a defendant over for trial when there exists a set of facts that supports'" "a believable and plausible account" or "a reasonable inference" that the defendant "probably committed a felony." *Id.*, ¶¶25, 64 (citations omitted).

¶24    In the case of a juvenile charged in adult court, however, the focus at the preliminary hearing, pursuant to WIS. STAT. § 970.032(1), is not on whether the juvenile committed "a" felony but on whether the juvenile probably committed the particular felony with which he or she is charged and which provides for the exclusive original jurisdiction of the adult court. *See Toliver*, 356 Wis. 2d 642, ¶9. "Probable cause to support a bindover exists in such a hearing when there is a reasonable probability 'that the juvenile has committed the violation of which he or she is accused under the circumstances specified in [WIS. STAT. §] 938.183(1)(a), (am), (ar), (b) or (c).'" *Toliver*, 356 Wis. 2d 642, ¶¶28, 30 (citation omitted). In this case, the court properly maintained adult-court jurisdiction and bound Geyser

over for trial as it found that the State had established probable cause that she had committed the charged adult-court-jurisdiction-conferring offense of attempted first-degree intentional homicide. That was all that was needed to maintain adult court jurisdiction and bind Geyser over for trial.

¶25 Geyser argues that the adult court "lost jurisdiction" because following the preliminary hearing, the court indicated that one of the reasons she attempted to kill the victim was her belief that if she did not do so, Slenderman would kill her or members of her family. She insists the case was thereby mitigated to attempted second-degree intentional homicide, a crime over which the adult court does not have exclusive original jurisdiction. Geyser posits that "because Wisconsin law does not require that self-defense be the sole motivation for a person's action before qualifying for the defense [of "unnecessary defensive force," WIS. STAT. § 940.01(2)(b)], the circuit court erred as a matter of law in binding her over in adult court." In brief, Geyser claims the court should have conclusively decided the mitigation question in her favor at the preliminary hearing stage, rather than allowing the matter to proceed to trial in adult court.

¶26 As previously indicated, however, "[a] preliminary hearing as to probable cause is not a preliminary trial or a full evidentiary trial on the issue of guilt beyond a reasonable doubt. It is intended to be a summary proceeding to determine essential or basic facts as to probability." *Anderson*, 280 Wis. 2d 104, ¶24 (citations omitted). And in the case of a preliminary hearing of a juvenile charged in adult court, "[p]robable cause to support a bindover exists … when there is a reasonable probability 'that the juvenile has committed the violation of which he or she is accused,'" *Toliver*, 356 Wis. 2d 642, ¶¶28, 30 (citation omitted), as the circuit court found in this case. We do not interpret the circuit court's recitation as to Geyser's motives for attacking the victim as amounting to a conclusive finding

11

that undermines, at the preliminary hearing stage, the court's unambiguous finding that probable cause existed that Geyser committed attempted first-degree intentional homicide. Even if sufficient evidence had been presented at the preliminary hearing of probable cause to *also* believe Geyser alternatively may have committed attempted second-degree intentional homicide or even if that same evidence, if presented at a trial, might have warranted a jury instruction on attempted second-degree intentional homicide, this would not "negate" adult-court jurisdiction where, as in this case, the court specifically found probable cause of the charged jurisdiction-conferring offense. *See State v. Kleser*, 2010 WI 88, ¶65, 328 Wis. 2d 42, 786 N.W.2d 144.

¶27　The relevant Wisconsin statutes read:

[WISCONSIN STAT.] **§ 940.01  First-degree intentional homicide.**

> **(1)** OFFENSES.  (a) Except as provided in sub. (2), whoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony.[4]
>
> ….
>
> **(2)**　MITIGATING CIRCUMSTANCES.　The following are affirmative defenses to prosecution under this section which mitigate the offense to 2nd-degree intentional homicide under [WIS. STAT. §] 940.05:
>
> ….
>
> (b) *Unnecessary defensive force.*  Death was caused because the actor believed he or she or another was in imminent danger of death or great bodily harm and that the force used

---

[4] Attempted first-degree intentional homicide is committed when a person attempts to cause, but does not succeed in causing, the death of someone "with intent to kill that person or another." WIS. STAT. §§ 940.01, 939.32; WIS JI—CRIMINAL 1070.

was necessary to defend the endangered person, if either belief was unreasonable.

(Footnote added.)

[WISCONSIN STAT.] **§ 938.183  Original adult court jurisdiction for criminal proceedings.**

    **(1)** JUVENILES UNDER ADULT COURT JURISDICTION. Notwithstanding [WIS. STAT. §§] 938.12(1)[5] and 938.18, courts of criminal jurisdiction have exclusive original jurisdiction over all of the following:

    ….

(am)  A juvenile who is alleged to have *attempted* or committed a violation of [WIS. STAT. §] 940.01 [first-degree intentional homicide] or to have committed a violation of [WIS. STAT. §§] 940.02 or 940.05 [second-degree intentional homicide] on or after the juvenile's 10th birthday.

(Emphasis added; footnote added.)

[WISCONSIN STAT.] **§ 970.032  Preliminary examination; juvenile under original adult court jurisdiction.**

    **(1)**    Notwithstanding [WIS. STAT. §] 970.03, if a preliminary examination is held regarding a juvenile who is subject to the original jurisdiction of the court of criminal jurisdiction under [WIS. STAT. §] 938.183(1), the *court shall first determine whether there is probable cause to believe that the juvenile has committed the violation of which he or she is accused* under the circumstances specified in [§] 938.183(1) … (am) …. *If the court does not make that finding*, the court shall order that the juvenile be discharged but proceedings may be brought regarding the juvenile under [WIS. STAT.] ch. 938.

(Emphasis added.)

¶28    As WIS. STAT. § 938.183(1)(am) provides, the adult court began with "exclusive original jurisdiction over" Geyser because she is a "juvenile who [wa]s alleged to have attempted ... a violation of [WIS. STAT. §] 940.01," first-degree

---

[5] WISCONSIN STAT. § 938.12 provides:  "**Jurisdiction over juveniles alleged to be delinquent.  (1)** IN GENERAL.  The court has exclusive jurisdiction, except as provided in [WIS. STAT. §§] 938.17, 938.18, and 938.183, over any juvenile 10 years of age or older who is alleged to be delinquent."

intentional homicide. Pursuant to WIS. STAT. § 970.032(1), "a preliminary examination [was] held," and the adult court "first determine[d] whether there [was] probable cause to believe that [Geyser] ha[d] committed the violation of which … she [was] accused under the circumstances specified in § 938.183(1) … (am)." Thus, following the preliminary hearing, the adult court had to determine whether there was probable cause to believe Geyser had committed attempted first-degree intentional homicide.

¶29    The next sentence of WIS. STAT. § 970.032(1) is key:  "*If* the court does *not* make *that finding*, the court shall order that the juvenile be discharged." (Emphasis added.)  Thus, under the plain language of § 970.032, even if there was evidence presented at the preliminary hearing supporting attempted second-degree intentional homicide, the adult court was not required to order Geyser discharged so long as it also found probable cause that she committed attempted first-degree intentional homicide.  *See Kleser*, 328 Wis. 2d 42, ¶57.  But, again, the adult court did specifically find probable cause that she committed attempted first-degree intentional homicide.

¶30    Geyser asserts that to maintain adult court jurisdiction and bind her over for trial, the State had the burden to "disprove" at the preliminary hearing her affirmative defense of unnecessary defensive force.  In support of this assertion, she cites to WIS. STAT. § 970.032(1) and our supreme court's decisions in *State v. Head*, 2002 WI 99, 255 Wis. 2d 194, 648 N.W.2d 413, and *Toliver*, 356 Wis. 2d 642. These authorities do not support her assertion and do not otherwise aid her.

¶31    WISCONSIN STAT. § 970.032(1) in no way supports Geyser's assertion that the State bore such a burden.  There is simply nothing in that statutory provision that can be interpreted as requiring the State to disprove Geyser's affirmative

defense in order for the adult court to maintain jurisdiction and bind her over for trial. Looking next to *Head*, we see that that case had nothing to do with preliminary hearings or even juveniles, much less exclusive original jurisdiction of an adult court over a juvenile. Rather, *Head* dealt with the admission of evidence related to perfect and imperfect self-defense (unnecessary defensive force) at a *jury trial* and submission of an instruction on those affirmative defenses to the jury. *Head*, 255 Wis. 2d 194, ¶¶2, 69. As our supreme court has repeatedly stated, however, a preliminary hearing "is not a preliminary trial or a mini-trial." *State v. O'Brien*, 2014 WI 54, ¶47, 354 Wis. 2d 753, 850 N.W.2d 8. *Head* too is not helpful to Geyser.

¶32 Regarding *Toliver*, Geyser writes:

> In *Toliver*, the supreme court upheld the adult-court bindover of a child charged with attempted first-degree intentional homicide specifically because he "did not introduce any evidence to support a reduced charge" at his preliminary hearing. *Toliver* pointedly cautioned that its outcome may have been "different" if the child "had introduced *evidence of mitigating circumstances* to support a charge that was *not consistent with* the exclusive original jurisdiction of the adult court." If Toliver had asserted a mitigation defense, wrote the court, "it would be difficult" to affirm the bindover.

Geyser's cherry picking of *Toliver* quotes is misleading absent the context in which the court made the quoted statements. *Toliver* provides Geyser no support.

¶33 The issue in *Toliver* was whether the record demonstrated that the circuit court had in fact made the required specific finding of probable cause to believe juvenile Toliver had committed the charged adult-court-jurisdiction-conferring offense of attempted first-degree intentional homicide. *Toliver*, 356 Wis. 2d 642, ¶¶3-4. The issue arose because the court failed to reference that specific offense in its ruling but instead merely stated that "there is probable cause to believe

*a* felony has been committed." *Id.*, ¶4 (emphasis added). Despite the court using the general "a felony" language utilized at preliminary hearings of adults in adult court, our supreme court determined from the totality of the record that the court implicitly had made the specific finding of probable cause to believe Toliver had committed attempted first-degree intentional homicide. *Id.*, ¶¶34, 36. The ***Toliver*** court made this determination because it was "abundantly clear from the transcript of the preliminary hearing that there was probable cause to believe Toliver attempted first-degree intentional homicide," "attempted first-degree intentional homicide was the only felony charged in the complaint," and "Toliver did not introduce any evidence to support a reduced charge." *Id.*, ¶32.

¶34     The ***Toliver*** court did comment, as Geyser indicates, that "[t]his might be a different case if Toliver had introduced evidence of mitigating circumstances to support a charge that was not consistent with the exclusive original jurisdiction of the adult court." *See id.*, ¶34. But the court appears to only have stated this because if there had been an alternative nonadult-court-jurisdiction-conferring felony placed in question during the preliminary hearing "it would [have been] difficult to say that [the circuit court] found probable cause for attempted first-degree intentional homicide *without saying more*" than just that it found probable cause to believe Toliver had committed "a" felony. *See id.* (emphasis added). It would have been "difficult to say" of course because a question would then have existed as to whether the court's "a felony" finding referred to the charged adult-court-jurisdiction-conferring felony (attempted first-degree intentional homicide) or the nonjurisdiction-conferring felony placed in issue during the hearing. Consistent with our earlier point that the adult court only loses jurisdiction if it does not find probable cause of the charged adult-court-jurisdiction-conferring offense, the ***Toliver*** court added, "[t]his *would* be a different case if the judge had *specifically*

*stated* that he did *not* find probable cause to believe Toliver committed attempted first-degree intentional homicide." *See id.* (emphasis added). In the case now before us, the circuit court made no such statement, but instead said just the opposite—that it *did* find probable cause that Geyser committed attempted first-degree intentional homicide.

¶35     Geyser also directs our attention to our supreme court's decision in *Kleser*, 328 Wis. 2d 42. Rather than aiding her, however, *Kleser* supports the conclusion that the circuit court did not err in declining to discharge Geyser from adult court.

¶36     As indicated, the plain language of WIS. STAT. § 970.032(1) states, "*If* the court does *not* make [the finding that 'there is probable cause to believe that the juvenile has committed the violation of which he or she is accused'], the court shall order that the juvenile be discharged." (Emphasis added). This language is echoed by *Kleser*.

¶37     While the charge against juvenile Kleser was first-degree intentional homicide, the *Kleser* court also discussed the application of WIS. STAT. § 970.032(1) to a hypothetical situation of a juvenile charged with first-degree *reckless* homicide, WIS. STAT. § 940.02(1). *Kleser*, 328 Wis. 2d 42, ¶¶2, 16, 64. Like the attempted first-degree intentional homicide charge at issue in the case now before us, first-degree reckless homicide is one of the offenses that confers exclusive original adult court jurisdiction over a juvenile under WIS. STAT. § 938.183(1)(am). Also, like attempted second-degree intentional homicide, second-degree reckless homicide, WIS. STAT. § 940.06, does *not* confer such jurisdiction.

¶38     The *Kleser* court explained that in a situation in which the State charges a juvenile with first-degree reckless homicide,

17

> *if* the court were to find probable cause to believe that the juvenile violated [WIS. STAT.] § 940.06 [second-degree reckless homicide] *but not* [WIS. STAT.] § 940.02 [first-degree homicide], [WIS. STAT. § 970.032(1)] would require the court to 'order that the juvenile be discharged' … *because* the court did *not* find probable cause for 'the violation' charged [first-degree reckless homicide] and the state could not amend the charge [to second-degree reckless homicide] and still qualify [for adult court jurisdiction] under [WIS. STAT.] § 938.183(1)(am).

*Kleser*, 328 Wis. 2d 42, ¶64 (emphasis added). Thus, *Kleser* confirms what WIS. STAT. § 970.032(1) says—that for the adult court to lose jurisdiction based upon a preliminary hearing, the court would have to fail to find probable cause to believe the defendant committed the specific adult-court-jurisdiction-conferring offense with which he or she is charged. Again, in the case now before us, the circuit court *did* find probable cause to believe Geyser committed attempted first-degree intentional homicide and the evidence at the preliminary hearing unquestionably supports that finding.

¶39 For the foregoing reasons, we conclude the adult court did not err in maintaining jurisdiction over Geyser and binding her over for trial.[6]

---

[6] We further note that WIS. STAT. § 940.01(2)(b), "Unnecessary defensive force," the mitigation defense relied upon by Geyser, requires a finding that the actor not only believed he or she or another was in danger of death or great bodily harm, but also that the actor believed such danger was "imminent." Although neither party discusses the impact of this word for this case, based upon the evidence that Geyser and Weier planned the attack for months, specifically chose Geyser's birthday sleepover as the occasion to commit the attack, contemplated the various manners of attack, and deliberately delayed the attack for subsequent opportunities, a reasonable fact finder could certainly conclude that when Geyser attacked the victim, she did not do so because she believed she was in *imminent* danger of death or great bodily harm. We note that the adult court's findings following the preliminary hearing did *not* include a finding that Geyser attacked the victim because of a belief she or others were in *imminent* danger of death or great bodily harm from Slenderman.

Failure to Suppress Geyser's Custodial Statement

¶40    Geyser insists the circuit court erred in denying her motion to suppress the incriminating custodial statement she made to Casey. She contends that due to her young age and mental state at the time, the waiver of her ***Miranda*** rights was not knowing, intelligent and voluntary. We need not determine whether the court erred in declining to suppress this statement because even if it did, such error was harmless as we are convinced beyond a reasonable doubt that even if the statement had been suppressed, it would have made no difference.[7]

¶41    Before we may hold that a federal constitutional error is harmless, the beneficiary of the error, here the State, must prove "beyond a reasonable doubt that

---

[7] Geyser contends it is inappropriate to apply the harmless error test in a case, such as this one, where the matter is resolved by a plea as opposed to a trial. Our supreme court, however, has shown that we may apply the harmless error test in the context of a plea. *See **State v. Armstrong***, 223 Wis. 2d 331, 335-36, 588 N.W.2d 606, *modified*, 225 Wis. 2d 121, 591 N.W.2d 604 (1999) (applying the harmless error test to a situation, similar to the one now before us, in which the defendant pled and thereafter appealed the circuit court's earlier denial of his suppression motion challenging an incriminating statement based on alleged ***Miranda*** violations); *see also **State v. Rockette***, 2005 WI App 205, ¶25, 287 Wis. 2d 257, 704 N.W.2d 382; ***State v. Semrau***, 2000 WI App 54, ¶¶21-22, 233 Wis. 2d 508, 608 N.W.2d 376. While Geyser makes additional arguments related to the applicability of the harmless error test, those arguments are undeveloped, and thus we do not address them. *See **ABKA Ltd. P'ship v. Board. of Review***, 231 Wis. 2d 328, 349 n.9, 603 N.W.2d 217 (1999).

the error complained of did not contribute to the [result]."[8] *See State v. Rockette*, 2005 WI App 205, ¶26, 287 Wis. 2d 257, 704 N.W.2d 382 (alteration in original; citation omitted); *State v. Hale*, 2005 WI 7, ¶60, 277 Wis. 2d 593, 691 N.W.2d 637.

¶42 As detailed earlier, accomplice Weier provided a statement to Trussoni that explained Geyser and Weier's months-long planning to kill the victim, as well as the details of their efforts to execute such a plan in conjunction with the birthday sleepover. According to Weier's statement, Geyser told Weier they needed to kill the victim to become "proxies" of Slenderman, originally planned for them to stab the victim in the neck in the middle of the night so she would "bleed out," took a knife from her home for the trip all three took to the park, and showed Weier the knife on the way to the park. Weier described how, once in the bathroom at the park, Geyser grabbed the victim's arms from behind in anticipation of Weier attacking the victim. Weier explained how all three subsequently began to play hide-and-seek before Geyser, signaled by Weier, began to repeatedly stab the defenseless and unsuspecting victim. Weier stated that they then left the victim in the woods, and as they walked from the area, Geyser told Weier that she believed

---

[8] Wisconsin's appellate courts at times have utilized differing terminology when considering harmless error in the context of a plea. *See Armstrong*, 223 Wis. 2d 331, ¶60 ("no reasonable *possibility* that a different result would have been reached" (emphasis added)); *Semrau*, 233 Wis. 2d 508, ¶26 ("no reasonable *probability* that, but for the trial court's failure to suppress the disputed evidence, Semrau would have refused to plead and would have insisted on going to trial" (emphasis added)); *Rockette*, 287 Wis. 2d 257, ¶26 ("An error is harmless if the beneficiary of the error proves *beyond a reasonable doubt* that the error complained of did not contribute to the [result]." (emphasis added) (citing *State v. Hale*, 2005 WI 7, ¶60, 277 Wis. 2d 593, 691 N.W.2d 637)). In the case now before us, we use the "beyond a reasonable doubt" standard because both parties refer to it and because we applied this standard more recently in *Rockette*, utilizing it in a plea context and adapting it from *Hale*, which was issued subsequent to *Armstrong*. This is an area of the law, however, in which the bench, bar and public could benefit from a clear and definitive articulation from the Wisconsin Supreme Court as to the proper standard to use in situations where harmless error is asserted in the context of a defendant having entered a plea.

she stabbed the victim seventeen times. Weier's statement was similar to Geyser's statement to Casey in almost all key respects related to the planning and execution of the attack on the victim, except that Geyser's statement tended to minimize her own involvement in the attack and place more of the blame onto Weier.[9]

¶43    We also see no reason why the victim, having survived the attack, would not present testimony at trial similar to the statement she provided to Fisher a week after the attack. According to Fisher's testimony at the preliminary hearing, the victim told Fisher that she had attended the birthday sleepover with Geyser and Weier. After breakfast, Geyser suggested they go to the park and packed food as well as pictures, which the victim believed was unusual for simply going to the park. The victim provided details similar to Weier's as to the unusual conduct of Weier and Geyser in the park bathroom and also told Fisher that Geyser locked the door to a stall when all three were in it, held back the victim's arms, and said to Weier, "I thought we agreed you were going to do this" and then "I need to talk to you in the next stall." The victim informed Fisher that Geyser subsequently suggested they take a walk in the woods, and when they were playing hide-and-seek, Geyser sat on the victim, whispered, "I'm so sorry," and then repeatedly stabbed the victim while pushing her down.

¶44    If Geyser had taken the case to trial, Renkas would also be expected to provide testimony similar to the testimony he provided at the hearing on Geyser's suppression motion. Renkas testified that he located Geyser a few hours after the attack. When he asked Geyser if she "had anything that would hurt [him], sharp

---

[9] Despite the State referencing the importance of Weier's statement in its harmless-error discussion of the response brief, Geyser makes no effort in her reply brief to suggest this statement, which was against Weier's own penal interest, would not have been presented to the jury if Geyser had taken this case to trial.

edges, needles, knives, et cetera," she told him there was a knife in her purse. When Renkas asked Geyser where the blood on her clothes came from, she responded that "she was forced to stab her best friend to death." In response to follow-up by Renkas, Geyser "said that she had a sleepover … and her and another girl had stabbed a girl and they were forced to stab her."

¶45 The State would almost certainly also call preliminary hearing witness Grunke as a trial witness. Grunke testified that the day of the attack, she processed Geyser into the juvenile detention center, and when Grunke asked Geyser if she "planned to do anything to end her life," Geyser responded, "not mine, no, not mine." Geyser indicated she was referring to her "best friend," but added, "well, she was my best friend … [s]he hates me now, but it had to be done." Geyser also told Grunke that she had started planning to kill her best friend as early as December 2013.

¶46 Even without the admission at a trial of Geyser's statement to Casey, the evidence of Geyser's guilt for the charged offense of attempted first-degree intentional homicide as a party-to-the-crime would be overwhelming. While Geyser's own statement to Casey contained significant incriminating admissions, all the key details confirming Geyser's guilt would be provided and corroborated through the other witnesses identified above.

¶47 Geyser claims the denial of her suppression motion was not harmless because "[w]ith the admission of [her] statement, a guilty verdict was a foregone conclusion." She strains: "With her statement suppressed, she may have avoided liability altogether," "convinced the jury to convict her of a lesser offense," or "likely … negotiated a more favorable resolution with the State." (Emphasis omitted.) Geyser relies upon general research about the significant inculpating

strength of a defendant's own confession. She makes no attempt, however, to discuss the overwhelming strength of the State's other evidence in this case, including her own incriminating comments to other officers besides Casey.

¶48 We fail to see—and Geyser provides us with no suggestion as to how—in light of the additional overwhelming and unchallenged evidence, the suppression of her statement to Casey could have produced any of the results she posits. The suggestion she may have "avoided liability altogether" is utter folly. And, she does not even attempt to suggest what "lesser offense" she might have been convicted of or how it is she might have been acquitted of attempted first-degree intentional homicide yet convicted of such a lesser offense. If she is referring to the possibility she could have been acquitted at trial of attempted first-degree intentional homicide, yet convicted of attempted second-degree intentional homicide, she completely fails to explain how such a better result might have come about simply due to suppression of her statement to Casey, in light of her incriminating comments to other officers, the victim's statement, and Weier's detailed statement mirroring Geyser's in all key respects. She fails to develop any of her speculative theories, and we are unable to envision how they might play out as she theorizes. There is nothing to suggest the case against Geyser for attempted first-degree intentional homicide would have been less likely to prevail at trial—or would have been stronger for Geyser to negotiate a better plea deal—if the circuit court had suppressed her statement to Casey.[10] The State has met its burden to show beyond a reasonable doubt that the denial of Geyser's motion to suppress this statement was harmless.

---

[10] Indeed, Geyser's statement to Casey appears to be the only statement which tended to minimize, albeit only slightly, Geyser's role in the attack.

¶49    Our harmless error analysis could end here.  Nonetheless, we respond to an additional claim of Geyser's that "[w]ith suppression, [she], at trial, may have come out ahead of her guilty plea; she certainly would have done no worse."  With this statement, Geyser ignores the benefits she gained through her plea and the risks she faced if she did not enter it.

¶50    If convicted of the charged offense at trial, but not found not guilty by reason of mental disease or defect, the circuit court could have sentenced Geyser to forty-five years of initial confinement in prison followed by twenty years of extended supervision.  *See* WIS. STAT. §§ 940.01, 939.32(a), 939.05, 939.63(1)(b).  By pleading, she essentially guaranteed herself a finding of not guilty by reason of mental disease or defect, as the State agreed to that as part of the plea deal—a finding which would not have been guaranteed if the matter had gone to trial.  With that finding, together with the striking of the five-year penalty enhancer—also part of the plea deal—the court could only commit her to the custody of the department of health services for a period "not to exceed" forty years, instead of sentencing her to initial confinement in prison for forty-five years.  *See* WIS. STAT. § 971.17(1)(b).  Furthermore, with the finding of not guilty by reason of mental disease or defect, Geyser is eligible to petition for conditional release every six months, *see* § 971.17(4), a significant benefit of her plea that would not have been available if she had been sentenced to prison.  Geyser's assertion that she "certainly would have done no worse" if she had taken the case to trial falls flat.

*By the Court.*—Order affirmed.